Rockingham, ⎱
 May 3, 1904. ⎰

## Rockingham County Light & Power Co. *v* Hobbs.

A statute authorizing an electric light and power company "to take and hold and to purchase and hold such lands and interests in land as may be reasonably necessary," and providing for the ascertainment and payment of the damages occasioned thereby, confers upon the corporation power to take land for a public use without the consent of the owner, through an exercise of the right of eminent domain.

Where a company engaged in generating and selling electricity locates wires in the highways, and procures and attempts to exercise the right of eminent domain, it takes upon itself the obligations of a *quasi*-public corporation, and is bound to supply electricity at reasonable rates and without discrimination to all persons, so far as it has the capacity to do so; and the use of land by such corporation for constructing and maintaining a line of wires in furtherance of its business is a "public use," within the meaning of article 12 of the bill of rights.

Petition, for an appraisal of the damages for the taking of certain rights in the defendant's land. Facts found by *Young*, J., at the October term, 1903, of the superior court. The defendant excepted to the court's ruling that the plaintiff was entitled to maintain the petition, and the question was transferred.

*Samuel W. Emery*, for the plaintiff.

*Eastman & Hollis* and *Arthur O. Fuller*, for the defendant.

Chase, J. The plaintiff is a voluntary corporation, formed under the general law (P. S., *c.* 147) for the purpose of "manufacturing, creating, furnishing, and selling for lighting, manufacturing, heating, transportation, propulsion of cars, machines, and engines, and for all mechanical, commercial, and business purposes, electricity and gas and all other illuminants and motive powers; to set poles and stretch wires to conduct and transmit the same, and to install and lay all necessary means or instrumentalities for conducting, storing, and transmitting the same." It is located at Portsmouth, and its business is to be carried on in the towns and cities of Rockingham and Strafford counties, and in Alton in Belknap county. By section 5, chapter 195, Laws 1901, it was authorized "to take and hold and to purchase and hold such lands and interests in land as may be reasonably necessary to carry out the purposes and objects for which it was organized." The intention of the legislature to delegate to the corporation the right to

take land without the owner's consent is unmistakably shown by the use of the words " to take,"—especially when read in connection with the words " to purchase " immediately following,—and by the provision made for the location of the land taken and the ascertainment and payment of the owner's damages.   The plaintiff relies upon this statute for its authority to take the desired interests in the defendant's land.   It proposes to construct and maintain a line of wires extending from a point in Hampton in a straight line to a point in East Kingston, and from the latter point in a straight line to a point in Salem,—a distance of about twenty-three miles.   This line crosses the defendant's land ; and in the location which the plaintiff has filed (P. S., c. 158, ss. 26, 3, 4), it particularly describes the line and the interest in land taken. The latter is, in substance, so far as the defendant's land is concerned, the right to set and forever maintain four poles of a certain size and height at designated points in the line; to string as many as fifteen wires upon cross-arms attached to the poles, not less than eighteen feet above the surface of the ground; to cut all trees within one rod either side of the line and trim other trees whose branches extend within this space ; and to enter upon the land as occasion requires for the purpose of inspecting, repairing, and renewing the poles, wires, and appurtenances.   The location further states that " there are to be transmitted along and upon said wires a high potential electric current to be used in operating street railroads, for power, lighting, and for other purposes ; and other weaker electric currents may be transmitted along and upon said line for various purposes."   The plaintiff's real purpose is to furnish power for the operation of the lines of electric railway located west, south, and east of Salem ; it also intends, if it has occasion, to furnish power for any of the purposes authorized by its charter.   It is reasonably necessary to take the specified interest in the defendant's land to carry into effect the corporation's purpose.

Article 12 of the bill of rights forbids, by implication, the taking of private property for private uses without the owner's consent.   *Concord R. R.* v. *Greely*, 17 N. H. 47 ; *Underwood* v. *Bailey*, 59 N. H. 480.   Unless, therefore, the use which the plaintiff proposes to make of the defendant's land is a " public use," within the meaning of those words as used in the bill of rights, the legislature had no power to grant to the plaintiff the right to take the land or an interest in it without the defendant's consent. Whether the contemplated use is of a public character, is a question of law.   *Concord R. R.* v. *Greely, supra ; Amoskeag Mfg. Co.* v. *Head,* 56 N. H. 386, 399.   The bill of rights contains no definition of " public use," and the court has not attempted to formulate

one. "That is left to be determined in each individual case by reference to the principles and reasons upon which the right to take private property for public use is founded, and by authority." *Great Falls Mfg. Co.* v. *Fernald,* 47 N. H. 444, 455.

It has been held in this state that the use of land for each of the following purposes is a public use: For a turnpike (*Petition Mt. Wash'n Road Co.,* 35 N. H. 134); for a toll bridge (*Piscataqua Bridge* v. *Bridge,* 7 N. H. 35); for a highway (*Peirce* v. *Somersworth,* 10 N. H. 369; *Backus* v. *Lebanon,* 11 N. H. 19); for a railroad (*Concord R. R.* v. *Greely,* 17 N. H. 47; *Northern R. R.* v. *Railroad,* 27 N. H. 183); for a public cemetery, it seems (*Crowell* v. *Londonderry,* 63 N. H. 42; *Evergreen Cemetery Ass'n* v. *Beecher,* 53 Conn. 551); and for making a survey by the United States as a part of the coast survey. *Orr* v. *Quimby,* 54 N. H. 590. In all these cases, excepting the last, the public have a common and equal right to the use of the land taken, for the purposes for which it is taken, subject to certain reasonable limitations, conditions, and regulations. In fact, the principal object of the taking is the accommodation of the public; and whatever benefit the corporation, through whose agency the right of eminent domain is exercised, derives therefrom is incidental to the main object, and is compensation for money, services, and skill contributed by it to the furtherance of that object. The decision in *Orr* v. *Quimby, supra,* is based on the idea that the use of the land for the purposes of the coast survey is necessary in order to provide "a safe highway upon the ocean,"—which, it was remarked, "is as much a public necessity as a safe highway upon the land."

It has also been held that the owner or occupant of land upon a stream of water may, by erecting a dam on his land, take the right to flow the lands of others without their consent, for use in connection with his mills, by complying with the provisions of the statute authorizing such taking; and that the use of land flowed under such circumstances is a public use within the meaning of the constitution. P. S., *c.* 142, *ss.* 12–19; *Great Falls Mfg. Co.* v. *Fernald,* 47 N. H. 444. Although attempts have been made to have this question reconsidered, and the reasons given for the decision have been vigorously attacked (50 N. H. 592; 56 N. H. 388), the court have regarded the question as settled and have declined to reopen it. *Ash* v. *Cummings,* 50 N. H. 591; *Amoskeag Mfg. Co.* v. *Head,* 56 N. H. 386; *Amoskeag Mfg. Co.* v. *Worcester,* 60 N. H. 522; *Amoskeag Mfg. Co.* v. *Goodale,* 62 N. H. 66. In speaking of the mill act, *Ladd,* J., said in *Salisbury Mills* v. *Forsaith,* 57 N. H. 124: "I agree with counsel for the defendant that the act goes to the verge of the constitutional power of the legislature, and I may say that, but for the authorities by which the court thought they

should be governed in the late case of *Amoskeag Co.* v. *Head*, I should find great difficulty in sustaining it." See, also, the remarks of the same judge in the case referred to, 56 N. H. 400. The courts of other states have given a like interpretation to similar provisions of their constitutions with reference to flowage. Lewis, in his work on eminent domain, after reviewing the decisions, concludes that " the only possible basis upon which the mill acts can stand is that mills are a public use, within the meaning of the constitution "; and that " this can only be true of that class of mills which are obliged to serve the public, and, unless the acts are limited to such mills, they cannot be sustained." Lew. Em. Dom., ss. 178–183. It would seem, therefore, that the doctrine of *Great Falls Mfg. Co.* v. *Fernald*, and like cases, is *sui generis*, and is not applicable to the full extent of its import in cases other than those specially relating to the taking of flowage rights. These cases cannot be regarded as deciding that " public use " in the bill of rights is synonymous with public benefit, public advantage, or any use that is for the benefit and welfare of the state. Whatever was said by *Perley*, C. J., in the Fernald case, having a tendency to show that such was his view, must be understood as having reference to the facts of that case, and not as expressing a general rule to be applied whenever the question of public use arises.

That the use of land for constructing and maintaining a line of wires to conduct currents of electricity employed in transmitting intelligence by telegraph or telephone for all persons who may desire such service, or in lighting public streets, highways, and buildings, etc., or in moving the cars of a railway serving the public, is a " public use " within the narrower meaning of those words, as applied in the above cited cases, is beyond question. P. S., c. 81, s. 13; Laws 1895, c. 27. It has been so held in other jurisdictions. *Pierce* v. *Drew*, 136 Mass. 75; *State* v. *Telephone Co.*, 53 N. J. Law 341; 1 Lew. Em. Dom., s. 172. Electricity is also extensively used for the transmission of power from the point where the power is accumulated by means of a waterfall, or by the combustion of fuel; to distant points for use there; and the prospect is that it will be used in the near future to produce and distribute heat in a similar manner. That the use of land for the production and distribution of power may be a public use is shown by the mill acts and the decisions respecting them, above cited. In the Fernald case, the dam and land flowed were several miles distant from the mills which used the water; and in *Amoskeag Mfg. Co.* v. *Worcester*, 60 N. H. 522, more than half of the water of the mill-pond created by the dam was used by other corporations and companies, who paid rent to the plaintiffs therefor. If the corporations and companies using the water had been *quasi-*

public,—if they were engaged in a public service like that of grinding grain for all parties who had occasion for such service, without discrimination in rates or other terms, and if the plaintiffs in those cases, so long as they had a surplus of water, were ready and willing to supply it upon like terms to all corporations or persons desiring it for such uses,—the decisions would not be subject to the criticism above mentioned. The knowledge recently acquired concerning electricity has made it possible to divide power into any desired portions and to freely transmit the same to almost any point for use. This has created a demand for power which, though not so universal as the demand for water, is nevertheless of a public character. Like water, electricity exists in nature in some form or state, and becomes useful as an agency of man's industry only when collected and controlled. It requires a large capital to collect, store, and distribute it for general use. The cost depends largely upon the location of the power plant. A water-power or a location upon tide-water reduces the cost materially. It may happen that the business cannot be inaugurated without the aid of the power of eminent domain for the acquisition of necessary land or rights in land. All these considerations tend to show that the use of land for collecting, storing, and distributing electricity, for the purposes of supplying power and heat to all who may desire it, is a public use, similar in character to the use of land for collecting, storing, and distributing water for public needs—a use that is so manifestly public "that it has been seldom questioned and never denied." 1 Lew. Em. Dom., *s.* 173.

The defendant has called attention to the recent case of *In re Rhode Island etc. Co.*, 22 R. I. 457, in which it was held that the use by an electric railway company of land situated five miles from its railroad line for a power-house and coal pockets was not a public use within the meaning of the constitution of that state, which in this respect is similar to that of this state. The decision is based on the proposition that the location of the power-house on the particular lot in question was not essential to the public service, but pertained only to the private interest of the company in its business details. With the knowledge of electricity thus far acquired, an electric railway cannot be operated without generating or collecting electricity in large quantities and transmitting it from the initial point to and along the railway. A power-house, or something answering the same purpose, is as essential to the public service as is the railway track itself. The court truly say in the Rhode Island case : "There is a class of cases where the public does not use the land itself, and yet the public necessity is so direct and obvious as to imply a public use. Such, for example,

are cases of taking land for engine-houses, car-houses, and repair shops on steam railroads. These buildings must necessarily be contiguous to the railroad; and while the public may not use the buildings as such, yet they are of such a character that without them the public could not adequately use the railroad itself. They are, in fact, a part of the railroad." See 1 Lew. Em. Dom., s. 170. This is emphatically true of the power-house in the case of an electric railway; but because of the difference in the necessities in the two cases,—a particular location adjoining the railroad line usually being imperatively necessary for an engine-house, etc., of a steam railroad, while an electric railway company has greater freedom of choice as to the location of its power-house,—the court held that the principle of the steam railroad cases referred to was not applicable to the taking of land for the latter purpose. It is probable that, in many cases, the establishment and operation of electric railways for the accommodation of the public will depend upon the possibility of generating or collecting electricity at a low cost. A water-power, or a port at which coal may be landed from sea-going vessels directly into the coal pockets of a power-house, will render it possible to furnish electric railway facilities for public use at points situated many miles distant from the water-power or port, that could not otherwise be furnished at all, or at least without much greater cost to the public. In such cases the imperativeness of the necessity attaches to the freedom of choice as to location, rather than to the proximity of a particular location to the railroad line. If land adjoining an electric railway may be taken for a power-house,—as to which there can be no doubt,—no good reason is apparent why land at a distance may not be taken if the public good so requires. Of course, if land located at a distance may be taken for a power-house, it must follow that necessary land or rights in land may be taken for constructing and maintaining a line of wires between the power-house and the railway. As has already been intimated, like reasons may exist for having the power-house of an electric light company, or other public service company, located at a distance from the place where the public service is rendered.

But it is not the intention of the plaintiff to make use itself of the electricity which it generates' or collects in either of the ways above mentioned, except possibly that of electric lighting. In fact, the plaintiff has no authority to engage in the business of transmitting intelligence by telegraph or telephone, or in a manufacturing business, or in operating a railroad. In this respect the case differs essentially from *Fallsburg etc. Co.* v. *Alexander*, 43 S. E. Rep. 194, cited by the defendant. Its purpose is to generate or collect electricity, and store, transmit, and sell it to those desiring it for

any use to which it is applicable. Its business in respect to electricity closely resembles that of an aqueduct company in respect to water. This business differs materially in several important respects from that of selling fuel and other articles of daily use. The capital and enterprise of private individuals are ordinarily sufficient for the latter purpose. It is not important that the business of dealing in such articles should be conducted in a single large enterprise, with supplies emanating from a single source. The business does not require the exercise of any governmental function. But, as has already been suggested, the collection, storing, and distribution of electricity, like the collection, storing, and distribution of water, requires large capital, favorable conditions, the use of the public streets, and sometimes the exercise of the right of eminent domain. *Opinion of Justices*, 182 Mass. 605, 608; *Opinion of Justices*, 150 Mass. 592.

If the plaintiff is under obligation to supply electricity or electric energy at reasonable rates and without discrimination to all corporations, public, *quasi*-public, and private, and to all persons desiring it, who are located within reasonable distances of the plaintiff's lines, so far as the extent and capacity of its works will permit, it appears to have all the characteristics of a *quasi*-public corporation. Its articles of association do not, in terms, impose this obligation upon it. They are, however, entirely consistent with the existence of the obligation. When the interpretation is considered which the plaintiff has given to the agreement by its acts in locating lines of wires in the public highways, and in procuring and attempting to exercise the right of eminent domain, it is apparent that the plaintiff intended by its articles of association to take upon itself the obligations of a *quasi*-public corporation in respect to the sale of electricity and electric energy. The delegation of the power of eminent domain to a corporation is not always accompanied with an express imposition of the obligation to serve the public reasonably and equitably. A corporation by the acceptance and exercise of the power impliedly undertakes such service respecting the subject for which the power is exercised. *Lombard* v. *Stearns*, 4 Cush. 60; *State* v. *News Co.*, 43 N. J. Law 381. In the numerous charters that have been granted to aqueduct companies in this state, containing authority for the exercise of the right of eminent domain, few, if any, have provisions specifying their public duties. The following are examples: Laws 1851, *c.* 1190; Laws 1863, *c.* 2817; Laws 1870, *c.* 83; Laws 1872, *c.* 95; Laws 1883, *c.* 191; Laws 1897, *c.* 155; Laws 1901, *c.* 292; Laws 1903, *cc.* 207, 272. Yet there can be no doubt that it is the duty of such corporations to supply water to persons located along their mains, without discrimination as to rates or

conditions. *Olmstead* v. *Aqueduct*, 47 N. J. Law 311; *Haugen* v. *Water Co.*; 21 Or. 411; 1 Lew. Em. Dom., *s.* 173. "In an act authorizing a right of way to be taken for the road of a turnpike company, the public right of using the road need not be expressly asserted. . . . The legal construction of such an act is not that some public benefit indirectly accruing from a private use of the land is a public use of it, but that by the exercise of the power of eminent domain the public acquire a right of way, subject to the payment of toll to the company who bear the expense that would be borne by the public if the road were free." *Holt* v. *Antrim*, 64 N. H. 284, 287. So in this case, the legal construction of the plaintiff's charter, as amended by the act of 1901, is that the public acquire a right to the service of the corporation upon equal and reasonable terms. *Snell* v. *Company*, 196 Ill. 626. This view of the charter distinguishes the case from *Avery* v. *Electric Co.*, 75 Vt. 235, cited by the defendant. The case also differs widely from *State* v. *Murphy*, 134 Mo. 548. In that case, the rights claimed were granted by the city of St. Louis, which was not empowered to grant them nor to enforce the reserved public rights; while in this case, the grant of power is direct from the state, and it retains control over the corporation and can protect the rights of the public.

In addition to the plaintiff's duty in this regard, the legislature have power to control the plaintiff in its dealings with the public. By section 19, chapter 148, of the Public Statutes, it is provided that "the legislature may at any time alter, amend, or repeal the charter of any corporation or the laws under which it was established, or may modify or annul any of its franchises, duties, and liabilities." This authority to control the duties of corporations was first introduced into the statutes upon the revision thereof in 1891, and furnishes additional assurance that corporations engaged in the public service, as well as other corporations, shall perform their duties to the satisfaction of the public. There seems to be no question concerning the validity of the statute. *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347.

Thus it is seen that all the elements of public use, in the limited sense of the words, exist in this case, and consequently that this petition may be maintained.

*Exception overruled.*

Young, J., did not sit: the others concurred.