## MINNESOTA CANAL & POWER COMPANY v. KOOCHICHING COMPANY and Others.[1]

March 30, 1906.

Nos. 14,592—(218).

**Eminent Domain.**

On appeal from an order dismissing a petition in condemnation proceedings in which the petitioner seeks to take private property (1) to create a water power and to construct, create, and maintain a water power plant to (a) supply water power from the wheels thereof, (b) generate and distribute electricity for heat, light, and power purposes, and (2) to construct and maintain canals and waterways on which to operate canal barges and be otherwise used for purposes of navigation, *held*, that the power of eminent domain can be exercised by a private individual or corporation only by express legislative authority.

[1] Reported in 107 N. W. 405.

**Presumption.**

In proceedings to condemn private property, every reasonable doubt as to the authority must be resolved in favor of the landowner.

**Power to Divert Water.**

The statutes under which the petitioner is organized do not, as an incident to the construction of a canal and the creation of a water power, authorize a corporation to withdraw and divert the waters from public navigable lakes and streams to such an extent as to interfere with present or future navigation and by means of canals carry it over a divide and discharge it into a different drainage area, thus permanently withdrawing it from its natural course.

**Private Purpose.**

When the purposes stated in the petition are part public and part private, the right to proceed must be denied.

**Public Use.**

A use is not public, unless, under proper regulations, the public has the right to resort to the property for the use for which it was acquired independently of the will or caprice of the corporation in which the title of the property vests upon condemnation.

**Sale of Electricity.**

The generation of electricity by water power for distribution and sale to the general public on equal terms, subject to governmental control, is a public enterprise, and property so used is devoted to public use.

**Sale of Water Power.**

But the creation of a water power and a water-power plant for the purpose of "supplying water power from the wheels thereof" to the public is a private enterprise, in aid of which the power of eminent domain cannot be exercised. The nature of water power is such that, under such conditions, it cannot be used by the public to such an extent as to make the use a public use.

Petition to the district court for Itasca county by the Minnesota Canal & Power Company for the appointment of appraisers in proceedings to condemn certain lands and interests therein necessary for the purposes stated in the petition and which are set forth in the opinion. The case was tried before McClenahan, J., who made findings of fact, and as conclusions of law found that private as well as public uses were involved in the purposes for which the condemnation was sought and that the petition should therefore be dismissed. From

the order and from a judgment of dismissal entered pursuant thereto, petitioner appealed.   Affirmed.

*O. H. Simonds, Durment & Moore,* and *Baldwin, Baldwin & Dancer,* for appellant.

*C. J. Rockwood,* for respondents.

*H. J. Grannis, J. N. Searles,* and *Washburn, Bailey & Mitchell* filed briefs by consent of court and counsel.

ELLIOTT, J.

This appeal involves the right of the appellant to condemn certain land situated on the Rainy river near Koochiching falls in Itasca county in aid of the construction of certain canals and the creation of a water power plant at West Duluth.   Upon this record we are required to determine whether the trial court was right in refusing to grant the prayer of the petitioner upon the facts as found.

The petitioner states that it

> Does not desire to physically take, acquire, or possess any of said lands hereinafter described, nor to erect, maintain, and operate any of its works upon the same, but it desires and has determined to divert the water of Birch lake and its tributaries, * * * and thus prevent the waters thereof so diverted from flowing in said boundary lakes and streams and through said province of Ontario in Canada over and along said lands, and to that extent only to take and injuriously affect said lands and any property and estate therein.

The petitioner is a corporation organized under chapter 34, G. S. 1894, for the purposes set forth with great prolixity and some lack of clearness in its articles of incorporation.   Without quoting the statement of the general nature of its business, which is set out in full in the findings of the trial court, it is sufficient to say that it is comprehensive enough to cover the enterprise in aid of which it seeks to acquire the defendants' property.   In the petition and findings of the court it is said that the

> Petitioner has undertaken to create a water power and to construct, create, and maintain a water power plant at West Du-

luth, Minnesota, to supply water power from the water wheels
thereof and also by the use of said power to generate and dis-
tribute electricity for light, heat and power purposes, and to
construct and maintain a canal or canals or waterways, from
Birch lake to Embarrass river and through the Embarrass river
to the St. Louis river and from the St. Louis river at the
point stated in said petition to West Duluth on which to oper-
ate canal barges for the transportation of various commodities,
and to float, raft, run, drive, and boom logs and timber.

A careful study of the petition convinces us that the primary ob-
ject of the enterprise is the creation of the water power plant, and
that the canal is merely in aid thereof, although, incidentally, it may
be used for purposes of navigation.  The enterprise, as described in
detail, provides for the taking of water in large quantities from
navigable streams and public lakes, carrying it by means of canals
over the divide which separates different water courses, and thus
permanently diverting it from its natural course.  The waters of the
Birch lake drainage area of one thousand one hundred three square
miles flow naturally north through the Birch river, the Kawishiwa
rivers, White Iron lake, Fall lake, Newton lake, and the streams con-
necting them into Basswood lake, which is one of the boundary wa-
ters between Canada and the United States.  Thence it passes through
certain waters on the boundary and through Canadian territory for
about twenty five miles into other boundary waters between the two
countries, including Rainy river, to the Lake of the Woods.  The
appellant's enterprise contemplates the building of dams across the
outlet of Birch lake and the Kawishiwa rivers in such a way as to
make Birch lake a storage reservoir in which to store the surplus
waters of its drainage area.  It then proposes to cut a canal from
Birch lake into the Embarrass river, and thus make a water com-
munication between Birch lake and the St. Louis river.  Another
canal is to be cut from a point on the St. Louis river about seventy five
miles below the point where the Embarrass river empties into it, to
the St. Louis bay near Duluth.  A dam at the head of the upper canal
at Birch lake and a gate at the head of the lower canal at the St.
Louis river will regulate the flow of the waters in the canals in such

manner as to let six hundred cubic feet of water per second flow through the upper canal into the St. Louis river and a somewhat smaller amount through the lower canal from the St. Louis river into the St. Louis bay.

Birch lake and the streams which flow into it, the North and South Kawishiwa rivers, White Iron lake, Farm lake, Newton lake, and the waters connecting the same, lie wholly within the state of Minnesota. Each of these lakes is capable of floating small steamboats and tugs and being used for the transportation of logs and other commodities. The streams connecting the lakes are not capable of being used by boats or transporting merchandise, because between each of the lakes there are rapids over which boats cannot pass. In times of high water logs or timbers pass down over these rapids, but in ordinary and low stages of water they cannot pass over the rapids without the aid of the head furnished by dams above the rapids. None of these waters within the state have ever been used for any navigation or commerce except the floating and flowing of logs and timber, which have been towed across the lakes and then sent down over the connecting streams and over the rapids ordinarily by the use of dams. A considerable commerce has been carried on over Birch lake and Birch river, and two dams have been constructed to aid in driving logs, one at the outlet of Birch lake, called a "clerking" or "sluicing" dam, and one at the foot of the river, near Fall lake, called the "roll dam." The latter was constructed for the purpose of preventing the logs from being bruised and jammed in making the descent of the steep rapids at that point. Steamboats have been used for towing logs on Birch lake, White Iron lake, Garden lake, and Fall lake. Steamboats have been also in regular use for the past ten years for general commerce upon certain of the boundary lakes and rivers which form a part of the chain of waters involved herein.

The minimum flow of water from Birch lake to the Kawishiwa rivers at any time in the course of the year is about two hundred ten cubic feet per second, and the average flow in the course of the year is nine hundred eighty cubic feet per second. The area of the watershed from which the appellant's enterprise would impound its waters is six per cent. of the area of the watershed tributary to

97 M.—28

Koochiching falls. The trial court finds that it is impossible to determine, except by the actual operation of the appellant's works, to what extent the diversion or withholding of six hundred cubic feet per second of the waters from the Birch lake area would lower the level of the waters throughout the chain of lakes and rivers referred to. Up to the present time, no foreign or interstate commerce of any kind has been carried on over the waters referred to, which lie wholly within the state of Minnesota. The country between Rainy lake and Birch lake is for the most part new and unsettled, but there has been sufficient travel along the waterway by rowboat and canoe to create and keep well-beaten portages along the different rapids. The respondent Backus and his associates own land on both sides of the Rainy river, and contemplate the construction of a dam and mills at Koochiching falls for the manufacture of paper, which enterprise contemplates the use of the water course for the transportation of the wood from the Birch lake country to the Koochiching falls.

As stated above, the appellant proposes to take the respondents' land in the manner stated for the following purposes: (1) To create a water power and to construct, create, and maintain a water power plant at West Duluth by which to (a) supply water power from the wheels thereof and (b) generate and distribute electricity for light, heat, and power purposes; (2) to construct and maintain a canal, canals, or waterways on which to operate canal barges and to be otherwise used for purposes of navigation. The trial court found that

> Said canals and waterways and the said water and water power and the said electricity are to be for the use of all municipalities, corporations, and persons who shall desire to use the same, and to be furnished by the petitioner as demand may develop to all such municipalities, corporations, and persons.

The respondents contend that there is no statutory authority for the appellant's enterprise, and also that the uses to which it proposes to put the property are, at least in part, private uses. The trial court refused to grant the petition, because

> The purpose for which the petitioning corporation is organized, and for which it seeks to condemn the lands and rights sought to be condemned * * * are not all public uses, but private uses are involved in and possible thereunder.

The appellant cannot exercise the power of eminent domain unless it is able to show legislative authority to do what it is seeking to do. The power must be clearly granted, and every presumption is in favor of the individual landowner.

As said by Chief Justice Start in Minneapolis & St. L. R. Co. v. Nicolin, 76 Minn. 302, 79 N. W. 304: "Authority for the petitioner to take land by condemnation for the purpose in question must be found, if at all, in the statute. If it is doubtful whether the statute confers the authority, the doubt must be resolved against the petitioners, no matter what the necessity of the case may be; for it is attempting to exercise one of the highest prerogatives a sovereign can delegate to a subject." Milwaukee & St. P. Ry. Co. v. City of Faribault, 23 Minn. 167; Fletcher v. Chicago, St. P., M. & O. Ry. Co., 67 Minn. 339, 69 N. W. 1085; Western Union Tel. Co. v. Pennsylvania R. Co. (C. C.) 120 Fed. 362; Holyoke Co. v. Lyman, 15 Wall. 500, 21 L. Ed. 133. To doubt in such a case is to deny. New Jersey Co. v. Morris, 44 N. J. Eq. 398, 15 Atl. 227, 1 L. R. A. 133. This rule is more than a mere aggregation of words. Enterprises which tend to develop the resources of the state should be encouraged, but it is only with the express authority of the legislature that the promoters can be permitted to apply the property of the people to the advancement of their enterprise. As well said by Justice Brewer in McElroy v. Kansas City (C. C.) 21 Fed. 257: "In these days of enormous property aggregation, where the power of eminent domain is pressed to such an extent, and where the urgency of so-called public improvements rests as a constant menace upon the sacredness of private property, no duty is more imperative than that of the strict enforcement of these constitutional provisions intended to protect every man in the possession of his own."

The constitution provides that "private property shall not be taken, destroyed or damaged for public use, without just compensation therefor, first paid or secured." The inevitable inference from this pro-

hibition is that private property shall not under any circumstances be taken for private use without the consent of the owner. Even the sovereign power of the state cannot take private property for public use without first making full and adequate compensation therefor. As said by Judge Sanborn in Dodge v. Mission Township, 107 Fed. 827, 46 C. C. A. 661, 54 L. R. A. 242: "A legislative act which takes or undertakes to authorize the taking of private property for a private object, either by taxation or by the exercise of the power of eminent domain, or by any other means, is not a law, but an arbitrary decree whereby the property of one citizen may be transferred to another. Such an act is beyond the limits of the powers granted by the people to the legislatures of the states, and is without legal force or effect. The legislative power of taxation and power of eminent domain are alike limited to the exercise thereof for public objects, and they cannot be successfully prostituted for private purposes."

But every citizen holds his property subject to the condition that the state may, in proper proceedings, just compensation being first paid or secured, take it for public uses. The sovereign may exercise this power directly, as when land is taken for a fort, or a public building, or it may delegate it to individuals or private corporations which are engaged in enterprises of a public nature. When thus delegated the power is always clearly defined and subject to definite restrictions as to the manner in which, and the purposes for which, it may be exercised. The right to take the private property of a citizen against his will is justifiable only on grounds of high public policy and on the theory that, in the last analysis, all property is held subject to the public use when necessary for the general benefit. It can be exercised only within the strict terms of the grant and subject to the constitutional restrictions. A corporation which asserts the right, under a delegation of power from the state, to take private property against the will of the owner, must show affirmatively that it has been granted the power for the specific purpose, and that it proposes to use the property, when it has been acquired, for the public use and not for private benefit.

Whether a certain use is public or private is a judicial, and not a legislative, question. Stewart v. Great Northern Ry. Co., 65 Minn.

515, 68 N. W. 208, 33 L. R. A. 427; Fairchild v. City of St. Paul, 46 Minn. 540, 49 N. W. 325. The legislature cannot by its mere fiat make a private use a public one. It follows that a statute which attempts to authorize the condemnation of private property for other than a public use is void without reference to any legislative declaration as to the nature of the use. In re Warehouse Co., 96 N. Y. 42; Dodge v. Mission Township, supra; Gaylord v. Sanitary District, 204 Ill. 576, 585, 68 N. E. 522, 63 L. R. A. 582, 98 Am. St. Rep. 235; Tyler v. Beacher, 44 Vt. 648, 8 Am. Rep. 398; Allen v. Inhabitants, 60 Me. 124, 11 Am. Rep. 185. As said in Lake Koen v. Klein, 63 Kan. 484, 65 Pac. 684: "Courts determine what is a public use; legislatures, when the power of eminent domain may be exercised in its promotion. Courts may not interfere to limit or control the discretion of the lawmaking power as to the character, quality, method, or extent of the exercise of the power of eminent domain by private person or corporation engaged in the promotion of a public use, when once it has been determined that such use is a public use." Fletcher v. Peck, 6 Cranch, 87, 128, 3 L. Ed. 162.

The respondent earnestly contends that the trial court has not found that the public interests require the prosecution of the appellant's enterprise. Section 2608, G. S. 1894, provides that the courts shall hear the proofs and allegations of the parties, and

> If the court shall be satisfied that the public interests require the prosecution of such enterprise and that the lands or real estate proposed to be taken are required and necessary for the purposes of such enterprise,

it shall make an order appointing commissioners to ascertain the amount to be paid to the owner. Under this section it is the duty of the court to determine, as a question of fact, whether the public interests require the proposed enterprise to be carried out. In re St. Paul & N. P. Ry. Co., 37 Minn. 164, 33 N. W. 701; Fohl v. Common Council, 80 Minn. 67, 82 N. W. 1097; Minneapolis & St. L. R. Co. v. Village of Hartland, 85 Minn. 76, 88 N. W. 423. In the case at bar the court refused to allow the petitioners to proceed, but placed its refusal upon other grounds. It is, however, reasonably clear from the findings that the court intend-

ed to find that the public interests required the prosecution of the enterprise, and that the petition would have been granted if it had been satisfied that the property was to be devoted to an exclusively public use.

Turning, now, to the source of the appellant's claim of authority, we find that section 2592, G. S. 1894, authorizes incorporation:

> For the construction, maintenance and operation of any work or works of internal improvement requiring the taking of private property, or any easement therein for public use, including railways, telegraph lines, canals, slackwater or other navigation upon any water course, bay or lake, dams to improve or create a water supply or power for public use, and any work or works with all requisite subways, pipes and other conduits for supplying the public with water, gas light, electric light, heat or power.

In the revision of 1866 the substance of this section appears in the following language:

> Any number of persons not less than five, may associate themselves and become incorporated for the purpose of building, improving and operating railways, telegraphs, canals or slackwater navigation upon any river or lake, and all works of internal improvement which require the taking of private property for public use. G. S. 1866, c. 34, tit. 1, § 1.

Water supply or power is not expressly referred to, and the canals which are authorized appear from the context to be such as are in aid of public communication—water highways. The language which relates to railways was added by chapter 14, p. 50, Laws 1875, and, as amended, the section appears in G. S. 1878, c. 34, tit. 1, § 1. Chapter 18, p. 32, Laws 1885, added the word "bay" after the word "river," and chapter 161, p. 269, Laws 1887, after the word "telegraphs," added the words "pneumatic tube lines, subway conduits for the passage, operation and repair of electric and other lines or pipes." In 1889 certain provisions relating to logging companies and the use of rivers were added to the statute, which appear as section 2633, G. S. 1894, and Laws 1893, p. 189, c. 74, gave the section the form in which it appears in G. S. 1894, § 2592.

Chapter 360, p. 579, Laws 1901, amending section 2604, G. S. 1894, as amended by chapter 51, p. 49, Laws 1899, provides:

> Any corporation organized or reorganized under the provisions of this title and any corporation organized for the purpose of improving, developing or using water power or for the purpose of generating, using or transmitting electricity for heat, light or power purposes may obtain the right of way over, through, under or across any lands needed for the construction and maintenance of any railroad, telegraph, telephone or pneumatic tube line, lines for the transmission of electricity or electrical power for public use and for subway conduits for the use, passage, operation and repair of electric and other lines or pipes, and all necessary sites and grounds for depots, shops and other buildings, requisite for the proper carrying on of the business to be transacted; and may obtain the right to overflow by reason of any dam, locks, sluices or other erection necessary for the convenient prosecution of its enterprise all and any lands damaged thereby; and may obtain the right to the use of any land for a towpath, the erection of necessary buildings for the purposes of said business and the right of way in and over the bed of any river, bay, lake, or watercourse and the banks thereof together with the right to overflow, injure or destroy any existing dams, mills or other property, and to canal in and along the valley of any such river, bay, stream, lake or watercourse and to purchase and erect all necessary buildings for the operation and prosecution of any manufacturing business upon water power incidentally created by such improvement, by proceeding as in this title provided.

Taking these sections together, it is apparent that the legislature has not expressly authorized the condemnation of land for the construction of a canal which is primarily designed for the creation of power, but incidentally for purposes of navigation. See note, 61 L. R. A. 853 (2a). Section 2592 authorizes the taking of private property for public use in the construction of canals to be used as public highways, but the subsequent statute restricts the canals which may be thus con-

structed to certain localities by limiting the right of way which may be condemned to such as is for a canal running parallel to the water course. The grant is of the right "to canal in and along the valley of any river, bay, stream, lake or water course." This peculiar language carries the idea that the legislature intended to keep the waters in their natural courses, and we are unable to find any statute which, fairly construed in the light of the presumption in favor of the landowner, authorizes any corporation or individual to construct a canal for the purpose of diverting and transferring the water from one watershed to another for any such objects as are set forth in the appellant's charter or petition.

The doubt as to whether the legislature intended to grant such power is strengthened when we consider the nature of the waters which the petitioner seeks to divert from their natural courses. It is not seriously contended that Birch river is not a navigable stream as defined by the courts of this and other states in which logging and lumbering is extensively carried on. The streams through which the water of Birch lake finds its natural outlet are navigable in fact, and have in the past and will in the future to an ever increasing extent be used as highways for the carriage of logs and the general products of the soil of the surrounding country. The public have a right of way in every stream which, in its natural state and ordinary volume, is capable of transporting to market the products of the forest or mines or of the soil along its banks. It is not essential that the property to be transported shall be carried in vessels or be guided by the hand of man. Nor is it necessary that the stream shall be capable of navigation against the current, or that it shall be navigable at all seasons of the year. It is sufficient if, from natural causes, it is navigable at certain seasons. 1 Farnham, Waters, p. 121; Castner v. Steamboat, 1 Minn. 51 (73); Schurmeier v. St. Paul & Pac. R. Co., 10 Minn. 59 (82), 88 Am. Dec. 59; Railroad Co. v. Schurmeier, 7 Wall. 272; Swanson v. Mississippi & R. R. Boom Co., 42 Minn. 532, 44 N. W. 986, 7 L. R. A. 673; St. Paul, S. & T. F. R. Co. v. First Div. St. Paul & Pac. R. Co., 26 Minn. 31, 49 N. W. 303; Willow River v. Wade, 100 Wis. 86, 76 N. W. 275, 42 L. R. A. 305; Davis v. Winslow, 51 Me. 264, 81 Am. Dec. 573; Dwinel v. Barnard, 28 Me. 554, 38 Am. Dec. 507; Hutton v. Webb, 124 N. C. 749, 33

S. E. 169, 59 L. R. A. 33; Farmers v. Albemarle, 117 N. C. 579, 23 S. E. 43, 29 L. R. A. 700, 53 Am. St. Rep. 606; Commissioners v. Catawba, 116 N. C. 731, 21 S. E. 941, 47 Am. St. Rep. 829; Gaston v. Mace, 33 W. Va. 14, 10 S. E. 60, 5 L. R. A. 392, 25 Am. St. Rep. 848; Felger v. Robinson, 3 Ore. 455; Hallock v. Suitor, 37 Ore. 9, 50 Pac. 384; Town v. Loveless, 72 N. Y. 211.

In The Montello, 20 Wall. 430, 22 L. Ed. 391, Justice Davis said: "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable, in its natural state, of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes, in law, a public river or highway." In St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, 168 U. S. 349, 18 Sup. Ct. 157, 42 L. Ed. 497, it is held that the existence of rapids does not destroy the navigable character of a stream. In Broadnax v. Baker, 94 N. C. 675, 55 Am. Rep. 633, it is said that "such waters lose not their navigability because intercepted by falls, when above and below them the waters can be thus used for the purpose of commerce for long distances."

What has been said with reference to the navigability of Birch river applies equally to Birch lake and the other lakes from which the appellant proposes to draw the water. For the purpose of ascertaining whether the state has authorized this interference with navigable water, it is necessary to examine the prohibitions which are found in the organic law of the state as well as the statutes. In the Ordinance of 1787 we find the statement that:

> The navigable waters leading into the Mississippi and St. Lawrence and the carrying places between the same, shall be common highways and forever free as well to the inhabitants of said territory as to the citizens of the United States and those of any other states that may be admitted into the confederacy, without any tax, impost or duty therefor.

The act authorizing the inhabitants of the territory of Minnesota to form a state government provides:

That the said state of Minnesota shall have concurrent jurisdiction on the Mississippi and all other rivers and waters bordering on the said state of Minnesota so far as the same shall form a common boundary to said state and any other state or states now or hereafter to be formed or bounded by the same; and said river and waters and the navigable waters leading into the same shall be common highways and forever free as well to the inhabitants of said state as to all other citizens of the United States without any tax, duty, impost or toll therefor.

Substantially, this provision appears as section 2 of article 2 of the constitution of the state. The first legislature which met under the constitution passed a law which now appears as section 2385, G. S. 1894, and provides that:

All rivers within this state of sufficient size for floating or driving logs, timber or lumber and which may be used for that purpose are hereby declared to be public highways so far as to prevent obstructions to the free passage of logs, timber or lumber down said streams or either of them.

It is conceded that Birch lake and Birch river and the other waters referred to are meandered waters, and section 6878, G. S. 1894, makes it a public offense to "drain or attempt to drain any lake, pond or body of water in this state which has been meandered" unless under express statutory authority. Dowlan v. County of Sibley, 36 Minn. 430, 31 N. W. 517. To unlawfully interfere with or obstruct the navigation of any lake or navigable river is a public nuisance. G. S. 1894, § 6613. Congress has also expressly prohibited the obstruction of any navigable waters of the United States without its consent (6 Fed. St. Ann. 783, 813, § 10), and the state is powerless to authorize any obstructions which would be a violation of the federal statutes. Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629; Escanaba Co. v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442. The act of September 19, 1890, provides that

The creation of any obstructions not affirmatively authorized by congress to the navigable capacity of any waters of which the United States has jurisdiction is hereby prohibited.

That these waters are navigable waters of the United States appears certain under the rule announced in The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999 (see notes to this case in volume 7 of Rose's Notes, p. 365 et seq.). In U. S. v. Rio Grande Dam & Irrigation Co., 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136, it is held that the diversion of waters from a navigable stream to such an extent as to appreciably impair its navigability is an "obstruction" within the meaning of the statute. It is true that the trial court has found that the carrying out of the appellant's enterprise would not substantially interfere with the capacity of the lakes for navigation or any other public use to which they have at any time been put. This finding deals entirely with conditions as they have existed in the past, and does not determine that the enterprise will not interfere with the more extensive use of the waters which is inevitable in the future as the country develops and commerce increases. The court does find that it would, at times, prevent the floating of logs over the rapids in the rivers connecting the lakes within the state unless the petitioner's dam would be so operated as to furnish water for the driving of the logs down the stream at such times as there should be logs to drive, "and it would not be impossible to so operate said dams." This means that the navigation of the streams would be placed under the control of the appellant, to be regulated as it should see fit, thus giving to it as an incident to the power to create a canal and a water power at Duluth the overlordship and control of navigation on large and important public waters of the state. There is at least one stream in this state over which such control has been delegated to a private corporation, but the intention of the legislature to convey similar powers over other streams should be made to appear by the unambiguous language of a positive statute.

We find no such grant, and, in view of the presumption in favor of the rights of the individual, the state and federal prohibition against the obstruction of navigable waters, the rule that the rights of the state in such waters are sovereign and not proprietary, that they are held in trust for the public as highways and cannot be alienable (Union Depot, St. Ry. & Trans. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. Rep. 789; Hanford v. St. Paul & D. R. Co., 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L. R. A. 722; Lamprey v. State, 52 Minn.

181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541; Bradshaw v. Duluth Imperial Mill Co., 52 Minn. 59, 53 N. W. 1066; Witty v. Board of Co. Commrs. of Nicollet County, 76 Minn. 288, 79 N. W. 112; Ross-miller v. State, 114 Wis. 169, 89 N. W. 839, 58 L. R. A. 93, 91 Am. St. Rep. 910), the possible effect upon the rights of riparian proprietors in the Province of Ontario, the fact that the doctrine of the appropriation of waters, adopted in some of the western states, does not prevail in Minnesota and is not recognized by the conventional law of nations (Pine v. Mayor, 112 Fed. 98, 50 C. C. A. 145; New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Holyoke Water Power Co. v. Connecticut River Co. [C. C.] 20 Fed. 71), the treaty relations between the United States and Great Britain with reference to the boundary waters between the United States and Canada (7 Fed. St. Ann. 583), and that the taking of the waters will interfere with streams and lakes which are already devoted to public uses, which can only be done under express statutory authority (Minneapolis & St. L. R. Co. v. Village of Hartland, 85 Minn. 76, 88 N. W. 423), we are constrained to hold that the appellant is not authorized to condemn the interests sought to be condemned in the lands of the respondent for the purpose of constructing the canal and creating the water power in the manner described in the petition. The petitioner's enterprise necessitates the doing of what is not only not expressly, or by fair inference, authorized, but is expressly forbidden by the statutes of the state of Minnesota and of the United States, without the consent of its representatives.

The appellant contends that the right to divert the waters of navigable streams and lakes can be determined only in an action to which the public is a party. The right to obstruct navigable waters has been determined in numerous cases between individuals, and it is not possible that the court should, in this proceeding, authorize the petitioner to do what it would restrain it from doing in another action. A proceeding to condemn land under the power of eminent domain cannot be maintained unless the use to which the property is to be devoted is exclusively a public use. The mere fact that the corporation has charter authority to condemn land for both corporate and private uses will not prevent the corporation from exercising the power for the pro-

motion of the public use only.   Lake Koen Co. v. Klein, 63 Kan. 484, 65 Pac. 684.   But where a proceeding is instituted in which it is sought to exercise the power to condemn property for both public and private uses indiscriminately—that is, where the purposes stated in the petition are part public and part private, the right to proceed must be denied. Chicago v. Galt, 133 Ill. 657, 23 N. E. 425, 24 N. E. 674; Gaylord v. Sanitary District, 204 Ill. 576, 585, 68 N. E. 522, 63 L. R. A. 582, 98 Am. St. Rep. 235.

The principle is recognized in Coates v. Campbell, 37 Minn. 498, 35 N. W. 366, and in Stewart v. Great Northern Ry. Co., 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427, where it was held that the statute under which the proceedings were commenced when properly construed forbade the use of the elevator for the private grain business of the petitioner.   The principle is illustrated by Harding v. Goodlett, 3 Yerg. (Tenn.) 41, 24 Am. Dec. 546, where it was sought to condemn land for a gristmill, sawmill and papermill under a statute that authorized the exercise of the power of eminent domain in aid of the building of gristmills.   The statute was held constitutional, but the court said, "The sawmill and papermill have no public character; the erection of these mills would be wholly for the private use of these petitioners.   *   *   *   Had the application been confined to the sawmill and the papermill, no one could for a moment hesitate in rejecting it.   Does the introduction of the gristmill, thereby asking the land for these complicated purposes, alter the case?   In my opinion the application is entitled to no more favor than if nothing was said about the gristmill.   If an application of this sort were granted, a like application for the erection of iron works, or any other establishment requiring water power, might be made, and would be entitled to equal favor, provided the applicant, as a pretext, were to associate a gristmill with his other works.   Thus the gristmill, the only thing mentioned in the act of assembly as having any claim to be of a public character, would be made the subterfuge for vesting in one citizen the land of another, and of giving to the whole establishment, of which it would be but an inconsiderable appendage, the high appellation of a public mill.   This would be mocking the citizen, who would thus be despoiled of his land to enrich another.   It would be holding out the idea that his land was taken for public use,

and that the public exigencies required it, when, in fact, this was only
used as a pretext for obtaining the land for private emolument." When
the taking is for a public use, it is, of course, no objection that incidental
and private advantage will result to the petitioners. Lien v. Board'
of Co. Commrs. of Norman County, 80 Minn. 58, 82 N. W. 1094;
Moore v. Sanford, 151 Mass. 285, 24 N. E. 323, 7 L. R. A. 151; In re
Mayor, 135 N. Y. 253, 31 N. E. 1043, 31 Am. St. Rep. 825; In re Ware-
house Co., 96 N. Y. 41.

It is probably impossible to reconcile all the authorities, and to make
them entirely consistent with any definition of a public use. With
the exception of a certain line of cases which have grown out of pe-
culiar conditions and apparent necessity, the authorities consistently
recognize the fact that a public use means a use by the public. The
question of the general public benefit is necessarily also involved, but the
two do not always exist together. In this state the court is required
to determine whether the proposed public use of the property will be
for the public benefit. There is no doubt but that this conception of
benefit and public utility and the general welfare of the state is involv-
ed in all the cases of this character. In some cases public benefit, in-
stead of public use, is made the test. It has been thought that any in-
strumentality which tends to promote the public good, such as manu-
facturing establishments which furnish labor for mechanics, develop and
utilize natural advantages, and create new markets for the products
of the community, are of such great public benefit as to justify the state
in taking private property in their aid. But such indirect advantages
to the general public do not justify the exercise of the power of eminent
domain. The contrary theory has, it is true, entered largely into the
decisions which have sustained the constitutionality of the various mill-
dam, drainage, mining, and irrigation statutes which have been enacted
in certain states. But these cases are recognized as exceptions. The
milldam acts originated in New England, at a time when transportation
facilities were poor and the public gristmill to which the people might
resort was not only a great public benefit, but also a practical neces-
sity. The early authorities sustained the acts upon the ground of the
incidental public benefit resulting to the community from such mills.
They were sustained on this ground by the early Massachusetts

decisions, and by Great Falls v. Fernald, 47 N. H. 444; Ash v. Cummings, 50 N. H. 591; Amoskeag v. Head, 56 N. H. 386; Amoskeag v. Worcester, 60 N. H. 522; Olmstead v. Camp, 33 Conn. 532, 89 Am. Dec. 221; Newcomb v. Smith, 2 Pinney (Wis.) 131; Fisher v. Horicon, 10 Wis. 351; Scudder v. Trenton, 1 N. J. Eq. 694, 23 Am. Dec. 756; Hankins v. Lawrence, 8 Blackf. (Ind.) 266. In the late case of Rockingham v. Hobbs, 72 N. H. 531, 58 Atl. 46, 66 L. R. A. 581, it is said that the earlier New Hampshire cases "cannot be regarded as deciding that 'public use' in the bill of rights is synonymous with public benefit, public advantage, or any use that is for the benefit of the state."

On the other hand many well-considered cases have held the milldam and flowage acts unconstitutional. Varick v. Smith, 5 Paige (N. Y.) 137, 28 Am. Dec. 417; In re Eureka Basin, 96 N. Y. 42; In re Tuthill, 163 N. Y. 133, 57 N. E. 303, 79 Am. St. Rep. 574, 49 L. R. A. 781; Ryerson v. Brown, 35 Mich. 333, 24 Am. Rep. 564; Berrian Springs v. Berrian, 133 Mich. 48, 94 N. W. 379; Tyler v. Beacher, 44 Vt. 648, 8 Am. Rep. 398; In re Barre Water Co., 62 Vt. 27, 20 Atl. 109, 9 L. R. A. 195; In re Rhode Island Suburban Ry. Co., 22 R. I. 457, 48 Atl. 591, 52 L. R. A. 879; Avery v. Vermont Ele. Co., 75 Vt. 235, 54 Atl. 179, 98 Am. St. Rep. 818, 59 L. R. A. 817; Southwest v. Scheurich, 174 Mo. 235, 73 S. W. 496.

In Miller v. Troost, 14 Minn. 282 (365), this court sustained the milldam act solely upon the authorities, but did not approve the doctrine upon which they rested. "It is true," said the court, "that the incidental benefit to the public from turning to use all the power from running streams may be very great and that such is the nature of the property in and along these streams that the power cannot be made fully available without such a law as that we are considering; but, to say the least, such a law goes to the extreme limit of legislative power, and, had not similar laws in states having constitutional restraints similar to ours been uniformly sustained by the courts, we should hesitate long before upholding this one. The decisions, however, are so numerous and by courts of so great authority that we are constrained to hold the law constitutional." The Massachusetts cases cited in Miller v. Troost are no longer authority for the doctrine that the milldam acts and special legislation authorizing the taking of private property for the purpose

of creating water power for manufacturing purposes can be sustained on the theory that the great public benefit resulting therefrom alone constitutes a public use of the property. The later cases hold that the right of eminent domain is not involved, and rest the validity of the legislation upon the general welfare clause of the constitution. Lowell v. City, 111 Mass. 454, 15 Am. Rep. 39; Turner v. Nye, 154 Mass. 579, 28 N. E. 1048, 14 L. R. A. 487; Brown v. Gerald, 100 Me. 351, 61 Atl. 785, 70 L. R. A. 472. This doctrine was also approved by the supreme court of the United States in Head v. Amoskeag Mfg. Co., 113 U. S. 9, 5 Sup. Ct. 441, 28 L. Ed. 889.

The drainage acts have also been sustained by this court. In Lien v. Board of Co. Commrs. of Norman County, 80 Minn. 58, 82 N. W. 1094, it is said that the authority to enact such statutes is derived from the police power, the right of eminent domain, or the taxing power, and that all courts agree in sustaining them when the act is in the interest of the public health, convenience, or welfare. A careful reading of that opinion and of that in State v. Board of Co. Commrs. of Polk County, 87 Minn. 325, 92 N. W. 216, 60 L. R. A. 161, will disclose that the cases rest but slightly upon the doctrine of eminent domain and more upon the general power of the legislature to provide for the general welfare, convenience, and health of the community. It is the doctrine applied in the later Massachusetts cases. It is expressly said that the doctrine is that which is applied to sustain the statutes which provide for the irrigation of arid lands.

The irrigation statutes and those regulating mining rest upon doctrines which form a distinct exception to general principles and arise out of peculiar conditions, which render the general principle inapplicable. Dodge v. Mission Township, 107 Fed. 827, 46 C. C. A. 661, 54 L. R. A. 242. The controlling principle is the right of the state to regulate the common interests of the owners of the common property. Head v. Amoskeag Mnfg. Co., supra; Wurts v. Hoagland, 114 U. S. 606, 5 Sup. Ct. 1086, 29 L. Ed. 229. In Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 163, 17 Sup. Ct. 56, 65, 41 L. Ed. 369, Justice Peckham said: "If it be essential or material for the prosperity of the community, and if the improvement be one in which all the landowners have to a certain extent a common interest, and the improve-

ment cannot be accomplished without the concurrence of all or nearly all of such owners by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made and the land rendered useful to all and at their joint expense. In such case the absolute right of each individual owner of land must yield to a certain extent to be modified by corresponding rights on the part of other owners for what is declared, upon the whole, to be for the public benefit."

Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, illustrates the exceptional character of this line of cases. "We do not desire to be understood by this decision," said Justice Peckham, "as approving of the broad proposition that private property may be taken in all cases where the taking may promote the public interest and tend to develop the natural resources of the state." Under normal conditions, the distinction must be made between a use which is public and the interest which is public. Where there is simply a public interest, as distinguished from a public use, the power of eminent domain cannot be exercised. The mere fact that the interest is of a public nature, and that the use tends incidentally to benefit the public in some collateral way, confers no right to take private property in invitum. A use is not public unless the public, under proper police regulation, has the right to resort to the property for the use for which it is acquired independently of the mere will or caprice of the person or corporation in which the title of the property would vest upon condemnation. Coates v. Campbell, 37 Minn. 498, 35 N. W. 366; Board v. Van Hoesen, 87 Mich. 533, 49 N. W. 898, 14 L. R. A. 114; Varner v. Martin, 21 W. Va. 534, 548; Fallsburg v. Alexander, 98 Va. 101, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855; Lewis, Em. Dom. § 165.

The appellant proposes to create a water power plant and to supply water power from the wheels thereof and to generate heat and electricity for heat, lighting, and power purposes. Here are two distinct purposes and uses to which it proposes to put the respondents' property, and, as we have already found, it is necessary that both should be public uses. Granting that the power of eminent domain may be used to aid in creating power, to be sold to all who desire it under reasonable conditions, and at prices subject to the control and regulation of

the state, it is apparent that the nature of the use must be determined by the character of the power and the physical conditions under which it is to be produced and sold. Electric lighting is universally recognized as a public enterprise, in aid of which the right of eminent domain may be invoked. Lewis, Em. Dom. § 131a. Corporations organized for the purpose of furnishing electric light to the public are quasi public corporations, and, under government control, must serve the public on terms and conditions common to all without discrimination. Owensboro v. Hildebrand (Ky.) 42 S. W. 351; Cincinnati v. Village, 57 Oh. St. 336, 49 N. E. 121, 41 L. R. A. 422; State v. Allen, 180 Mo. 27, 77 S. W. 868; Griffin v. Goldsboro, 122 N. C. 206, 30 S. E. 319, 41 L. R. A. 240. The same rule has been applied to corporations organized to supply the inhabitants of cities with natural gas for heating and lighting purposes. Bloomfield v. Richardson, 63 Barb. (N. Y.) 437; State v. Toledo, 48 Oh. St. 112, 26 N. E. 1061, 11 L. R. A. 729. The right of natural gas companies to exercise the right of eminent domain is recognized in Consumers v. Harless, 131 Ind. 446, 29 N. E. 1062, 15 L. R. A. 505, and in Carothers v. Philadelphia, 118 Pa. St. 468, 12 Atl. 314. The control of the state over the manner in which such companies shall deal with the public is implied. State v. City of St. Louis, 145 Mo. 551, 565, 46 S. W. 981, 42 L. R. A. 113, reversing State v. Murphy, 134 Mo. 548, 31 S. W. 784, 34 S. W. 51, 35 S. W. 1132, 34 L. R. A. 369, 56 Am. St. Rep. 515. See also Lake Keon v. Klein, 63 Kan. 492, 65 Pac. 684, and cases there cited, and section 2592, G. S. 1894.

Most of the cases which involve the use of electricity refer primarily to lighting; power being secondary and incidental, but wherever the question has been raised it has, with the possible exception of Brown v. Gerald, 100 Me. 351, 61 Atl. 785, 70 L. R. A. 472, been held to a public use. See Hollister v. State (Idaho) 71 Pac. 541; Salt Lake v. Salt Lake, 24 Utah, 249, 67 Pac. 672, 61 L. R. A. 648; Id., 25 Utah, 441, 71 Pac. 1067; Denver v. Denver, 30 Colo. 204, 69 Pac. 568, 60 L. R. A. 383. In the recent case of Rockingham Co. v. Hobbs, 72 N. H. 531, 58 Atl. 46, 66 L. R. A. 581, it appears that the corporation was organized for the purpose of "manufacturing, creating, furnishing, and selling for lighting, manufacturing, heating, transportation, propulsion of cars, machines and engines, and for all mechanical, com-

mercial, and business purposes, electricity and gas and all other illuminants and motive powers." It was held that the corporation had no right to devote its property to private uses and the court said: "The knowledge recently acquired concerning electricity has made it possible to divide power into any desired portions and to freely transmit the same to almost any point for use. This has created a demand for power which, though not so universal as the demand for water, is nevertheless of a public character. Like water, electricity exists in nature in some form or state, and becomes useful as an agency of man's industry only when collected and controlled. It requires a large capital to collect, store and distribute it for general use. The cost depends largely upon the location of the power plant. A water power or a location upon tidewater reduces the cost materially. It may happen that the business cannot be inaugurated without the aid of the power of eminent domain for the acquisition of necessary land or rights in land. All these considerations tend to show that the use of land for collecting, storing, and distributing electricity for the purposes of supplying power and heat to all who may desire it is a public use similar in character to the use of land for collecting, storing and distributing water for needs—a use that is so manifestly public 'that it has been seldom questioned and never denied.'" Citing Lewis, Em. Dom. § 173. The nature of electrical power is such that it can be indefinitely subdivided and readily transmitted to great distances for use by any number of people for purposes now recognized and innumerable others which the future will certainly disclose. Its development for public uses is in its infancy, but such is the rapid growth of scientific knowledge and mechanical skill that there is every reason to believe that within a few years it will practically supplant all other forms of power.

The generation of electrical power for distribution and sale to the general public on equal terms is a public enterprise, and property so used is devoted to a public use. But the creation of a water power plant for the purpose of "supplying water power from the wheels thereof" is an entirely different proposition. Water power is not, like electrical power, capable of being subdivided into innumerable units and transmitted long distances. The petition states that the com-

pany intends to sell the water power from the wheels to all who desire to purchase it, and the appellant admits that it will be subject to government regulation. But words cannot always conceal facts. This statement of the company's purpose cannot control the fact that it is a physical and mechanical impossibility for water power to be sold from the wheels to more than a few persons. A public use does not require that the property be capable of being used by the entire public or by any particular portion thereof, but a use which, by physical conditions, is restricted to a very few persons who must use it within a very restricted area, is not a public use. Water power from the wheels must be used at the wheels, and the actual result, necessarily, is that a very few individuals will use the power for manufacturing purposes to the exclusion of all others. The effect is the creation of a power plant to create water power to sell to a few manufacturers for use in their private business. Under such conditions the willingness of the power company to sell power from the wheels to the general public has only a theoretical value.

The judgment and order of the trial court are affirmed.

LEWIS, J. (dissenting.)

I dissent. The natural, fair, and reasonable import of the language employed in the statute authorizes the incorporation of companies for the purpose of constructing, maintaining, and developing canals for the purposes of navigation and also for the purpose of creating water power for public use, and confers upon such corporations the right of eminent domain to the extent necessary to carry those objects into effect. Such improvements may be developed independently or they may be worked out jointly, and there is nothing in petitioner's articles to justify the assertion that navigation is not one of the primary objects to be attained. There is no reasonable ground for the conclusion that it was the intention of the legislature to limit the right of way for such canals to the particular watershed where the waters are to be secured. There was no object in fixing such a limitation, since it would prevent the working out of the very spirit and purposes of the statute.

It is not material in this case that the lakes and streams constituting the Birch lake watershed are navigable waters and find a final outlet

into an international stream.   It is of no importance that the enterprise diverts a portion of those waters over a divide into another water course. The question here is:   How much, if any, does the working out of the plan damage respondent in its capacity as a riparian landowner, by diverting waters which would otherwise flow by its premises?   To the extent of the injury suffered in such capacity compensation must be assessed.   But in so far as respondent is interested in common with the general public, it has no standing in court to raise objection to an interference with public rights in navigable waters.   All of respondents' private interests, however affected, may be condemned and paid for; such interest being subject to the rights conferred upon public service corporations.   This proceeding does not undertake to interfere with public rights.   There is no attempt here to condemn them.   The state has no authority to confer such authority, and if, in putting the scheme into execution, petitioner diverts waters so as to affect the public interests therein, then the constituted public authorities may call it to account or enjoin the infringement.   In this case, however, the trial court accepted every position (save one) contended for by petitioners; found that the public interest required the development of the enterprise; and did not find that respondent would be damaged in the least. The court denied the petition upon the grounds, only, that private interests were subserved.

I dissent, also, from the decision of the majority to the effect that there is such a distinction between water power converted into electrical energy and water power as such, that the former is susceptible of public use whereas the latter is only available for private use.   No authority cited and no principle of law supports such distinction.   This case does not come within the principle involved where a special statute confers the right of eminent domain upon special private enterprises.   It is not analogous to the milldam acts, where the right of eminent domain is conferred upon a private party upon the theory that the business is of such public importance as to warrant it.   There is no commingling of public and private uses in the articles and petition. It is true that water power, as such, cannot be so economically and widely distributed as electricity, but it can be to some extent, if deemed advisable.   **It is to be assumed that the petitioner will make the most**

of its opportunity, and, being a public service corporation, it is subject to the control of the state, to the end that the public shall be served to the best advantage and at reasonable rates. The mere fact that the petitioner may incidentally receive pecuniary or private advantage is no objection, and that possibility is applicable to all public service corporations.

START, C. J. (dissenting.)

I also dissent, and concur in the views expressed by Justice LEWIS.