MINNESOTA CANAL & POWER COMPANY v. ISAIAH PRATT and
Others.[1]

June 7, 1907.

Nos. 14,917—(148).[2]

**Eminent Domain—Public Service Corporation.**

R. L. 1905, § 2841, authorizes certain corporations to condemn such private property as may be necessary or convenient for the transaction of the public business for which they may be formed under such statute. *Held,* that the term "public business," as so used, includes the construction of works for supplying the public with water, light, heat, and power.

**Same—Electric Power.**

R. L. 1905, §§ 2841, 2842, 2926, 2927, conferring the power of eminent domain on public service corporations for specified purposes, authorizes the exercise of such power in aid of the construction of canals and reservoirs to be used to create and distribute electric power for general public use.

**Same—Interference with Navigable Waters.**

A public service corporation, although authorized to condemn private property for the construction of canals and reservoirs for the generation of electric power, may not exercise such power when the particular enterprise contemplates an interference with the navigable capacity or navigation of any of the navigable waters of the state, unless such interference is expressly authorized by statute.

**Government Control.**

Public service corporations, organized and existing under the authority of the state, authorized to exercise the power of eminent domain, thereby become subject to governmental regulation and control.

**Same—Not a Condition Precedent.**

Where a public service corporation was organized to furnish water, light, heat, and power for public use, and, being authorized to exercise the power of eminent domain, became subject to state regulation and control, the actual exercise of the state's power to regulate and control such corporation did not constitute a condition precedent to the use of its power of eminent domain; the state being authorized to pass such regulatory measures as the future business of the corporation might require.

[1]Reported in 112 N. W. 395.          [2]October, 1906, term.

**Franchise or Contract Not a Condition Precedent.**

Where a public service corporation was authorized to furnish water, light, heat, and power for public and private use, it was not necessary that it should have first obtained a franchise from a municipality or a contract to furnish a city or village with its products before it was entitled to exercise its power of eminent domain, conferred by R. L. 1905, §§ 2841, 2842.

**State Control of Navigable Streams.**

In the absence of the exercise of power conferred by the federal government over navigable streams within the states, incident to its power to regulate commerce, the states have full power over such waters within their jurisdiction.

**Federal Control of Navigable Streams.**

Navigable waters entirely within the limits of a state are subject to the same control by the federal government as those extending through or reaching beyond the limits of the state.

**Water Power—Petition to Condemn—Pleading.**

In a proceeding to condemn land in aid of an enterprise which requires the construction of dams, reservoirs, and canals for the purpose of creating a water power with which to generate electric power for public use, the petition for the appointment of commissioners alleged facts which, if true, justify the conclusion that the works, when completed, would not materially interfere with the navigation of the waters to be affected thereby. Motions by various landowners to dismiss the petition were treated by the trial court as demurrers. *Held* that, assuming the allegations of the petition to be true, the contemplated use of the public navigable waters is not forbidden by the laws of the state.

**Concurrent Control of Navigable Streams.**

Act Congress March 3, 1899, c. 425, §§ 9, 10, (6 Fed. St. Ann. 805), requiring the consent of the secretary of war on the approval of the chief of engineers to the construction of public works in any navigable waterway within the United States, does not transfer exclusive control over navigable waters entirely within the limits of a state to the federal authorities; but the right of private persons to erect structures in such waters is dependent upon the concurrent or joint consent of both the state and federal governments.

**Consent of Federal Government.**

Under such act a public service corporation should not be permitted to exercise the power of eminent domain in furtherance of an enterprise involving an interference with navigable waters within the state without having first procured the approval of its plan by the officers of the federal government.

**International Comity.**

The use and control of waters lying within the geographical boundaries of the United States is not restrained by international comity.

**Treaty is a Municipal Law.**

A treaty entered into by the United States in accordance with constitutional requirements, which is operative by its own force, constitutes a municipal law, binding upon the federal and state courts, as well as an international contract.

**Violation of Treaty Provisions.**

A substantial diversion of the waters forming a part of the international boundary between the United States and Canada would constitute a violation of the Webster-Ashburton Treaty, 1842, art. 2, declaring that all water communication from Lake Superior to Lake of the Woods, etc., shall be free and open to citizens of both countries. Act of Congress of March 3, 1899, c. 425, reserves to the United States control over navigable waters within the states, subject to the conditions expressed in the statute. The act does not affect or in any respect modify the treaty. It merely authorizes the secretary of war to determine whether any contemplated enterprise will divert the waters or otherwise improperly affect navigation. If congress in the manner provided by this act approves an enterprise, the question of the violation of the treaty thereby is no longer for the consideration of the courts, as a subsequent act of congress, if inconsistent with the terms of an existing treaty, abrogates the treaty, so far as the courts or citizens of this country are concerned.

In the district court for St. Louis county the Minnesota Canal & Power Company filed its petition to condemn certain property.

Parts of the petition are quoted in the first opinion. The works necessary to accomplish petitioner's purposes and described at length in the petition comprised the Birch lake reservoir, the Kawishiwi reservoir, the Isabelle reservoir, and such other reservoirs in the Birch lake drainage basin as shall hereafter be found desirable and necessary, the Embarrass river canal, the St. Louis river canal, a power house and machinery on St. Louis bay for the generation and distribution of electricity, pipes for delivering water from the St. Louis river canal at Duluth to said power house and the water wheels therein, transmission lines for distributing such electricity to users thereof, pipe lines for delivering water to consumers thereof and chutes for delivering logs, lumber and forest products from said St. Louis river canal into the Bay of St. Louis.

On the return day of the notice different defendants appeared and moved that the petition be dismissed. From an order of Cant, J., dismissing the petition, in which it was stated that the motions were treated by all the attorneys as in effect demurrers to the petition on the ground that it did not state facts sufficient to constitute a cause of action, petitioner appealed. Affirmed.

*O. H. Simonds, C. O. Baldwin* and *W. L. Penfield,* for appellant.

Under the statutes of Minnesota, as they existed before the revised laws of 1905 went into effect, the right of eminent domain for the construction of a canal for any purpose, other than that of navigation, did not exist. The revised laws of 1905 materially amended the laws in this respect. G. S. 1894, § 2592, is repealed, and R. L. 1905, § 2841, is substituted. G. S. 1894, § 2604, as amended by Laws 1901, c. 360, is repealed, and R. L. 1905, §§ 2842, 2926, are enacted in its stead. G. S. 1894, § 2385, is expressly repealed and we have in lieu thereof R. L. 1905, § 2550. The word "canals" in R. L. 1905, § 2927, indicates clearly what the legislature meant by the broad language used in sections 2841 and 2842 of that revision.

Under the statutes of the United States, the construction of dams and the diversion of water, as proposed by appellant, may be authorized by the chief of engineers and the secretary of war. River and Harbor Act of March 3, 1899, §§ 9, 10.

The questions of the Webster-Ashburton treaty and of the comity of nations are political questions within the exclusive cognizance of the United States government. This is not the forum to which the decision of the questions belongs. If the enterprise of the petitioner is in contravention of the Webster-Ashburton treaty, it is so by virtue of the subsequent act of congress of March 3, 1899. The act of congress being the last expression of the sovereign will, it must control. Cooley, Const. Law, 32; Chae Chan Ping v. U. S., 130 U. S. 581. The petitioner contends that the authorized diversion of the waters would not infringe the treaty of 1842; but "the question whether our government is justified in disregarding its engagements with another nation is not one for the determination of the courts." Taylor v. Morton, 2 Curtis, 454, 459; Knox v. Lee, 12 Wall. 457. Neither rights of private property nor personal rights are vested under or guar-

antied by art. 2 of the Webster-Ashburton treaty.   British or Canadian governmental rights or claims do not properly belong to the consideration of this court.   Canadian private or corporation rights are not here cognizable;   on the American side all rights of private property are subject to the paramount right of eminent domain.

It is immaterial whether the state of Minnesota or the federal government is the first to give consent to the construction of the works. If the petitioner should attempt to build canals or dams without the consent of either, the judicial authorities of the violated sovereignty would enjoin and abate the nuisance.   U. S. v. Rio Grande Dam & Irrigation Co., 174 U. S. 690.   A sovereign state has, by the law of nations, in the absence of treaty, the absolute legal control and disposition of all its interior waters.   Opinion of Atty. Gen. Harmon, 21 Opin. Atty. Gen. 274;   notes exchanged between the Mexico embassy and the department of state, and the treaty lately concluded with Mexico (printed in this brief).   The authority of the state cannot protect the works, if they are an obstruction to the navigable streams of the United States.   U. S. v. Rio Grande Dam & Irrigation Co., supra. But where a river is wholly within the limits of a state, the state can authorize any improvement which will enhance its value as a means of transportation from one point of the state to another.   Sands v. Manistee River Imp. Co., 123 U. S. 288;   County of Mobile v. Kimball, 102 U. S. 691;   Huse v. Glover, 119 U. S. 543.   A bridge constructed in accordance with legislation of both the state and federal governments must be deemed a lawful structure.   Corfield v. Coryell, 4 Wash. (C. C.) 371, 378.   The plan of petitioner is brought within the limitations of the power of a state to change the common-law rule as to streams within its own dominion mentioned in U. S. v. Rio Grande Dam & Irrigation Co., supra; 184 U. S. 419.

The contentions of the respondent before this court that the consent of the federal government must be first obtained and before the executive departments that the consent of Minnesota must be first obtained are of a nature that, if they were adopted, they would shackle the hands of both the general and state governments in the improvement of navigable waters, and in their use for irrigation, for sanitary and domestic purposes, as well as for the generation of electric power. As it is impossible that the authority of each should be first obtained,

the consent of neither could be obtained. The consent of each and of both is a condition precedent to the doing of that thing; the order of time in which the consent is severally given is immaterial. If it were necessary or proper that the authorities of Minnesota should delay action until the authorities at Washington had first acted, the courts of Minnesota should first decide the question whether the state legislature has not given due power and authority to the petitioner to carry out its project. In re New York Central & H. R. Co., 77 N. Y. 248; Union Pacific v. Colorado, 30 Colo. 133; California v. Kimball, 61 Cal. 90; 2 Lewis, Em. Dom. § 395; Chicago v. Dunbar, 100 Ill. 110; In re Gilbert Ele. Ry. Co., 70 N. Y. 361; In re Suburban R. T. Co., 38 Hun, 553.

*H. J. Grannis* and *J. N. Searles,* for respondent St. Croix Lumber Co.

An examination of the petition in this case and of that in the case of Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429, shows that the character of the works proposed to be constructed, for the aid of which the power of eminent domain is sought, is substantially the same in each. The present petition on its face shows that the primary object of the canals to be constructed is the creation of power and not for navigation. The court in that case gave to the word "canals" as used in G. S. 1894, § 2592, its ordinary meaning, viz., an artificial channel for transportation. There is nothing in the context to suggest any different meaning of the word "canals" as used in R. L. 1905, § 2841. The claim of counsel for petitioner, that the words occurring in R. L. 1905, § 2841: "Any work for supplying the public by whatever means," etc., confers authority to construct a canal for power purposes and to divert waters into such canal, is clearly untenable. If it were intended to confer such power the same would have been given by express enactment which would leave no doubt as to legislative intent. Minnesota Canal & Power Co. v. Koochiching Co., supra. R. L. 1905, § 2927, is cited by counsel for petitioner in support of their claim that canals for the creation of power are included in the use of that word in section 2841. Section 2927 is detached from and entirely independent of section 2841. As its title indicates, it has reference to "use of public roads." The section has no necessary connection with public service corporations. It reads

"any water power," etc., "company may use public roads," etc. Its provisions are open alike to private and public service corporations. No powers of eminent domain are sought to be conferred thereby.

Petitioner is not a public service corporation and as such entitled to exercise the power of eminent domain, for it proposes to deal with individuals and is under no legal restraint as to its methods of business or rates. Provisions in the articles that all the works are to be constructed and maintained "for public use on equal terms" by all municipalities, persons and corporations, "for a reasonable compensation, subject to the supervison and control of the state of Minnesota," do not take the place of law. The articles can be amended so as to drop out this provision, under R. L. 1905, § 2871. Brown v. Gerald, 100 Me. 351; Stewart v. Great Northern Ry. Co., 65 Minn. 520; Minnesota Canal & Power Co. v. Koochiching Co., supra; Coates v. Campbell, 37 Minn. 498; Varner v. Martin, 21 W. Va. 534, 548; In re Eureka Basin Warehouse & Mnfg. Co., 96 N. Y. 42; Ryerson v. Brown, 35 Mich. 333; Board v. Van Hoesen, 87 Mich. 533; Gilmer v. Lime Point, 18 Cal. 229; Jordan v. Woodward, 40 Me. 317; Olmsted v. Proprietors, 47 N. J. L. 311; Fallsburg v. Alexander, 101 Va. 98; Snell v. Clinton, 196 Ill. 626; Griffin v. Goldsboro, 122 N. C. 206; Cincinnati v. Village, 57 Oh. St. 333; Owensboro v. Hildebrand, 19 Ky. L. 983; Township of Burlington v. Beasley, 94 U. S. 310; Munn v. Illinois, 94 U. S. 113. There must be regulations fixing charges and methods of business in effect, and it is not sufficient that the state by statutory provision reserves the right merely to effect such regulation. State v. White River, 39 Wash. 648.

Certain corporations are quasi public, at common law, and as such are under duty to serve all alike for a reasonable compensation, but this doctrine is based upon the fact that they have dedicated their property to public use, or have obtained a franchise from a municipality, or exercise a virtual monopoly. (Street car companies) State v. Spokane, 19 Wash. 518; (gas companies) Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 411; Owensboro v. Hildebrand, supra; Cincinnati v. Village, 57 Oh. St. 336; (natural gas companies) State v. City, 48 Oh. St. 112, 138; (telegraph companies) State v. St. Louis, 145 Mo. 551; (irrigation companies) San Diego v. Souther, 90 Fed. 164;

Merrill v. South Side, 112 Cal. 426; Wheeler v. Northern, 10 Colo. 582; Prescott v. Flathers, 20 Wash. 454; (water companies) Griffin v. Goldsboro, 122 N. C. 206; Wiener v. Louisville, 130 Fed. 251; (telephone companies) Cumberland Tel. & Tel. Co. v. City of Evansville, 127 Fed. 187; (bridge companies) Covington Drawbridge Co. v. Shepherd, 21 How. 112; (canals) Gue v. Tidewater Canal Co., 24 How. 257; (express companies) 3 Cook, Corp. § 924; (electric light companies) Edison v. Farmington, 82 Me. 464; (ferry companies) 3 Cook, Corp. § 926; (insurance companies, plank roads and turnpikes, steamship lines, wharf companies, boom companies, pipe lines) 3 Cook, Corp. §§ 928, 932, for citations. Certain enterprises are not quasi public, and subject to regulations by the courts. (Stock yards) Delaware v. Central, 46 N. J. Eq. 280; (cotton press companies) Ladd v. Southern, 53 Tex. 172; (slaughter houses) Putnam v. Ruch, 56 Fed. 416. The petitioner is not a public service corporation and as such entitled to exercise the power of eminent domain, for the reason that the use to which the property to be condemned is to be put is not a public use within the definition given in Minnesota Canal & Power Co. v. Koochiching Co., supra. The articles defining the business of the corporation use the expression : "to generate electricity, * * * for public use," but the petition goes beyond this in taking property for purposes that will enable it to be used for private use, such as operating machinery of a single industry without any municipal boundary and hence without the requirement of a franchise, which would bring it within the common law power of the courts to prevent discrimination.

Irrespective of any concessions either in the petition or brief, both the trial court and this court will take judicial notice of the fact that these waters are navigable waters both of the state and of the United States. Viebahn v. Board Commrs. of Crow Wing County, 96 Minn. 276; The Montello, 11 Wall. 411; U. S. v. Rio Grande Dam & Irrigation Co., 174 U. S. 690; McCarter v. Hudson (N. J. Eq.) 61 Atl. 710; Com. v. King, 150 Mass. 221; Clark v. Cambridge, 45 Neb. 798; 1 Elliott, Ev. § 66.

The state, as trustee for the public, has not authorized and cannot authorize the obstruction, diversion and use, of the waters in question,

as proposed by the petitioner. This rule applies to surplus waters, so called, as well as to waters actually used for purposes of navigation. Union Depot St. Ry. & T. Co. v. Brunswick, 31 Minn. 297; Hanford v. St. Paul & Duluth R. Co., 43 Minn. 104; Lamprey v. State, 52 Minn. 181; Bradshaw v. Duluth Imp. Mill Co., 52 Minn. 59; Witty v. Board of Co. Commrs. of Nicollet County, 76 Minn. 286; Minnesota Canal & Power Co. v. Koochiching Co., supra; McLennan v. Prentice, 85 Wis. 427, 445, Priewe v. Wisconsin, 103 Wis. 537, 550; Village of Pewaukee v. Savoy, 103 Wis. 271, 274; Williow River v. Wade, 100 Wis. 86; Rosmiller v. State, 114 Wis. 169; Illinois Central R. Co. v. Illinois, 146 U. S. 387; Stockton v. Baltimore & N. Y. R. Co., 32 Fed. 9; Woodruff v. North Bloomfield, 18 Fed. 753, 778; McCarter v. Hudson (N. J. Eq.) 61 Atl. 710; 1 Farnham, Waters & Water Rights, 172. These respondents, because of their special interests, are entitled to invoke the protection of the state, as trustee of said waters. Minnesota Canal & Power Co. v. Koochiching Co., supra; Viebahn v. Board Commrs. of Crow Wing County, 96 Minn. 276.

The claims of the petitioner involve a surrender by the state of rights of sovereignty over certain navigable waters and the abdication of its trusteeship with reference thereto. Illinois Central R. Co. v. Illinois, supra; Minnesota Canal & Power Co. v. Koochiching Co., supra.

Within the purview of the petition there is no doctrine applicable to surplus waters of navigable streams which distinguishes the same from other waters. For limitations of the right to use surplus waters see 28 Am. & Eng. Enc. (1st Ed.) 1052; Green Bay v. Kaukauna, 70 Wis. 635; Same v. Same, 90 Wis. 370; Kaukauna Water Power Co. v. Green Bay & Mississippi Canal Co., 142 U. S. 254; Green Bay & Mississippi Canal Co. v. Patten Paper Co., 172 U. S. 58; Same v. Same, 173 U. S. 179.

Indefiniteness of description of the property and rights sought to be condemned and taken is a sufficient reason for the order dismissing the petition. The petition does not show how much water the purposes of the company require. The only limitation is that the indefinite quantity will not interfere with navigation. Aliso v. Baker, 95 Cal. 268; Hamor v. Bar Harbor, 78 Me. 127; Village v. McCrea, 165

N. Y. 264; City v. Stacey, 86 Hun, 441; McGhee v. Hudson, 85 Tex. 587.

The failure to retain, in the revised laws, G. S. 1894, § 2385, does not alter the situation. That statute was merely declaratory of the common law and in any event its repeal cannot impair vested rights. A river capable of floating or driving timber or lumber, which may be used for that purpose, is a navigable stream and a public highway. Rhodes v. Otis, 33 Ala. 578; Whisler v. Wilkinson, 22 Wis. 546, 572; Wadsworth v. Smith, 11 Me. 278; Treat v. Lord, 42 Me. 552; Thunder Bay v. Speechly, 31 Mich. 336. Riparian rights in these waters became vested in the various riparian owners and cannot be divested by the repeal of the statute. Union Depot St. Ry. & T. Co. v. Brunswick, supra; Const. (Minn.) art. 1, §§ 7, 11; Const. (U. S.) art. 1, § 10; Amend. 9, § 1. Art. 2, § 2, Const. (Minn.) establishes as common highways all streams that form boundaries between Minnesota and other states of the Union, at the time of the adoption of the constitution, and that might afterwards be created, and navigable waters leading into such streams.

Section 2550, R. L. 1905, does not confer upon the petitioner any rights with respect to the waters and streams involved. The statute can have no possible application to the present proceeding. It can only be taken advantage of by an owner of land bordering on that part of a stream or watercourse, not navigable by steam, but available for the floating of logs, lumber or timber.

The interference with and diversion of the waters of Birch lake and of the streams and lakes below the same is prohibited by the United States statutes, except under certain conditions, and compliance with these conditions has not been shown. 26 St. 454, c. 10; 30 St. 1151, §§ 9, 10. The respondents should not be subjected to the annoyance and expense of resisting proceedings to acquire their lands, under the power of eminent domain, where the right of petitioner to proceed depends upon the granting of an authority which does not now exist. Authority of the United States over these waters is controlling. Minnesota Canal & Power Co. v. Koochiching, supra; Viebahn v. Board of County Commrs. of Crow Wing County, 96 Minn. 276; U. S. v. Bellingham Bay Boom Co., 176 U. S. 211.

The control by the United States over these waters, for the purposes of navigation, extends to the surplus waters and the state cannot, either directly or indirectly, authorize any interference with or diversion of such surplus waters. Green Bay & Mississippi Canal Co. v. Patten Paper Co., supra; Wisconsin v. Duluth, 96 U. S. 379, 387; South Carolina v. Georgia, 93 U. S. 4.

Where these waters form the boundary between the United States and Canada they are protected by art. 2 of the Webster-Ashburton treaty, August 9, 1842. Const. (U. S.) art. 6 provides that "this constitution and the laws of the United States and all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

*Jaques & Hudson* and *Wilson G. Crosby,* for other respondents.

*Washburn, Bailey & Mitchell* filed by consent a brief on behalf of Great Northern Power Co., which appellant adopted as a reply brief.

Petitioner seeks to acquire only private rights and does not ask to interfere in any manner with the public use of waters. Riparian rights which belong to the owner of the adjacent land and are appurtenant to it are held in this state to be alienable. They may be acquired under the power of eminent domain. Hanford v. St. Paul & Duluth Co., 43 Minn. 104. In determining this case it is immaterial whether or not petitioner has acquired other rights that may be necessary to its development. California v. Kimball, 61 Cal. 90; Union Pacific v. Colorado, 30 Colo. 133; Denver v. Denver, 30 Colo. 204; In re New York Central & H. R. Co., 77 N. Y. 249, at p. 254.

The petition is not defective for failing to state a definite amount of water to be diverted. The allegations of the petition that the surplus waters will produce many thousand horse power and that there is a public demand and necessity for this power, stand admitted. The amount of damage to the land is determined not by the amount of water taken from it, but by the uses which are destroyed, by the uses to which the land with the water could have been put which have been destroyed by the taking.

The right may be acquired by condemnation to divert water from a public stream for a lawful purpose where there is no interference with a public use. (1) Section 2841 authorizes corporations to construct, acquire, maintain or operate "any work for supplying the public by whatever means, with water, light, heat or power, including all requisite subways, pipes, and other conduits." The statutes certainly authorize the carrying out of the petitioner's plans. "Any work" and "by whatever means" are the most general terms that could be found. (2) The riparian owner under our decisions has the right to make any use of the water flowing past his property which can be made without any interference with the public. Morrill v. St. Anthony Falls Water Power Co., 26 Minn. 222; Hanford v. St. Paul & Duluth R. Co., 43 Minn. 104. The supreme court of this state has long ago held that the state's title is a sovereign title and not in any sense proprietary. Bradshaw v. Duluth Imp. Mill Co., 52 Minn. 59, 65. (3) The right which the riparian owner has to have the water flow past his land in its natural state is private property and may be acquired under the law of eminent domain. By acquiring the private right the public right is not in any manner affected. Hanford v. St. Paul & Duluth R. Co., supra; State v. Centralia, 42 Wash. 632; State v. Sunapee, 70 N. H. 458; McKeen v. Delaware, 49 Pa. St. 424; St. Helena v. Forbes, 62 Cal. 182; Bigelow v. Draper, 6 N. D. 152; Philadelphia v. Pottsville, 182 Pa. St. 418; In re City of New York, 168 N. Y. 134. The state in its sovereign capacity may regulate the public use of a stream, and damage to the individual from such regulation is not subject to compensation. St. Anthony Falls Water Power Co. v. St. Paul Water Commrs., 168 U. S. 349; State v. Sunapee, supra. The question has frequently arisen, especially in the eastern states, where waters are diverted under the general law for the creation of water supply. Lakeside v. City, 186 Mass. 552; 30 Am. & Eng. Enc. (2d Ed.) 364; Beidler v. Sanitary District, 211 Ill. 628. The right of the state to authorize the diversion, both navigable and nonnavigable, to furnish a water supply for the public has been often upheld. St. Anthony Falls Water Power Co. v. St. Paul Water Commrs., supra; Burden v. Stein, 27 Ala. 104; Hamor v. Bar Harbor, 78 Me. 127; Ætna Mills v. Waltham, 126 Mass. 422; Ætna Mills v. Brookline, 127 Mass. 69; Baltimore v. McGruder, 34

Md. 79; Smith v. City, 92 N. Y. 463; Pocantico v. Bird, 130 N. Y. 249. (4) If it be contended that no distinction can be made between the waters necessary for navigation and the surplus and that all of the waters of the stream must be considered as devoted to a public use, then the principle, well established by our decisions, that under the general law with reference to the power of eminent domain property devoted to one public use may be taken for another and different public use where not inconsistent with the first use, and where both may stand together without material impairment, will apply. St. Paul Union Depot Co. v. City of St. Paul, 30 Minn. 359; St. Paul, M. & M. Ry. Co. v. City of Minneapolis, 35 Minn. 141; Northwestern Tel. Exch. Co. v. Chicago, M. & St. P. Ry. Co., 76 Minn. 334; Fohl v. Common Council, 80 Minn. 67; Minnesota, etc., v. Village of Hartland, 85 Minn. 76. (5) If it be contended that the petitioner's rights will be left indefinite and that without right it may take water which is needed for a public use, then the answer is that a court of equity has inherent power to regulate the use of property where a private right conflicts with a public right, or where two public uses may conflict. Connecticut v. Olcott Falls, 65 N. H. 290; Delaware v. Erie, 21 N. J. Eq. 298; National v. Central, 32 N. J. Eq. 755.

Petitioner is a public service corporation. Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429; Stewart v. Great Northern Ry. Co., 65 Minn. 515. To be subject to public control the monopoly feature is not at all important. People v. Budd, 117 N. Y. 1; Budd v. New York, 143 U. S. 547; State v. Brass, 2 N. D. 482, 497; Same v. Same, 153 U. S. 399. The point that there is no statute regulating the methods and rates of petitioner has been many times raised and has never been determined in accordance with counsel's contention so far as we know. Olmsted v. Proprietors, 47 N. J. L. 311; Haugen v. Albina, 21 Ore. 411; Stewart v. Great Northern Ry. Co., supra; Charleston v. Lowe, 52 W. Va. 662, 671; Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396; Cincinnati v. Village, 57 Oh. St. 333, 345; Crumley v. Watauga, 99 Tenn. 420; American v. State, 46 Neb. 194; State v. Butte City, 18 Mont. 199; Rockingham v. Hobbs, 72 N. H. 531.

101 M.—14

ELLIOTT, J.

In this proceeding the Minnesota Canal & Power Company seeks to condemn certain lands necessary for the construction of works designed and intended for the generation of electric power for distribution to the public for the purposes of light, heat, and power. The respondents moved to dismiss the petition on the ground that it did not state facts sufficient to constitute a cause of action. The motions were treated as in the nature of demurrers, and for the purposes of the hearing the allegations of the petition must be treated as true. The trial court granted the motions to dismiss, and the petitioner appealed from a judgment entered on the order of dismissal.

In the recent case of Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429, 107 N. W. 405, this petitioner was denied the right to exercise the power of eminent domain in aid of the construction of its proposed works, because the purposes stated in the petition in that action were in part private, and upon the further ground that the statutes of this state as they then stood did not authorize the construction of the canal and the diversion of the waters as proposed. The present proceeding is for the condemnation of other lands belonging to private persons in aid of the same enterprise which was somewhat fully described in the opinion in the Koochiching case. Since that action was determined the petitioner has amended its charter, and now contends that the objections which proved fatal in that case have been eliminated, because it now seeks to divert only so much water as may be diverted without injury to any present or possible future public use thereof, and to use the land which it proposes to take for a public use only. It is also claimed that certain statutes which were considered in the Koochiching case were repealed by R. L. 1905, and new statutes were enacted which grant larger powers with reference to the diversion of waters.

According to this petition the work of internal improvement which the petitioner now proposes to undertake involves

> The construction and maintenance of a continuous navigable watercourse from and within the territory hereinafter described and designated as the Birch lake drainage basin, in St. Louis and Lake counties, Minnesota, to a point * * * in West Duluth, which shall include the construction and maintenance of a navigable canal connecting said Birch lake drainage basin with

the Embarrass river, thence along said Embarrass river to a point in the northerly end of Sabin lake, * * * and the improvement of the Embarrass river and the lakes along the course thereof, and the St. Louis river below the outlet of the Embarrass river, down to [a designated point] in St. Louis county, Minnesota, the construction and maintenance of a navigable canal from said last-mentioned point on the St. Louis river easterly to said point in the city of Duluth, * * * and the construction and maintenance in connection therewith of a suitable device or chute for delivering logs, lumber, timber, forest and other products from the east end of said canal at the point last described to and into the said bay of St. Louis, which canal shall be of such size, dimensions, and capacity as to allow the floating of canal boats and barges and other water craft thereon for the transportation of merchandise, and to allow the floating of logs, lumber, timber and forest products thereon, which watercourse shall be capable of delivering the logs, lumber, timber, forest, and other products from said Birch lake drainage basin and from said St. Louis river and its tributaries to and into the bay of St. Louis at the said city of Duluth and the water tributary to the St. Louis river canal hereinafter described

This work involves and will require

The diversion into said watercourse of such portions of the waters of the said Birch lake drainage basin as may be required to carry out the purposes of this corporation, and the diversion of which will not interfere with the navigation, navigable capacity, or public use of the waters of the said Birch lake drainage basin and the various lakes and streams to which they are tributary and the diversion into said St. Louis river canal of the waters tributary thereto.

The object and purpose of the enterprise is described as

The furnishing and distribution, by means of such watercourse and said work, of water to municipalities, persons, and corporations for public use; the generation of electricity by means of the water power hereinafter described, and the supply-

ing of such electricity for public use to all municipalities, persons, and corporations desiring the same for light, heat, and power purposes, which water power shall be created by conducting in pipes and conduits the waters so diverted from the east end of·said St. Louis river canal to the power plant of your petitioner, which will be located at or near the level of the bay of St. Louis, at said city of Duluth, under a head of six hundred feet or thereabouts.

The Birch lake drainage basin and the waters tributary thereto are described in the opinion in the Koochiching case, and what is there said will not be repeated. The detailed description of the petitioner's work will be found in the petition herein. It would require too much space to describe the projected works, although it is necessary to have the designs clearly in mind in order to clearly understand the issues.

1. The petitioner is met at the threshold with the assertion that it is not a public service corporation, and cannot, therefore, under any circumstances at present exercise the power of eminent domain. This contention seems to be the result of an inversion of ideas. It would be more nearly correct to say that the appellant is a public service corporation, because it has been granted the power of eminent domain in aid of the purposes for which it was incorporated. The power of eminent domain is not given to public service corporations eo nomine. Certain corporations organized to serve the public are given the right to exercise this sovereign power as the agent of the state. What have become known as "public service corporations" are organized and exist under the authority of the state to serve the public, by supplying the people on equal terms and for a reasonable compensation with services or commodities and articles which, because of their nature, location, or manner of production and distribution, can be best produced and distributed by some organized form of enterprise operating under state control.

The statutes do not define public service corporations, although the Revised Laws of 1905 carry the name as the heading of section 2841, which authorizes the organization of corporations for the specific purposes therein enumerated. The power of eminent domain is specifically granted to the corporations which may be organized under this section

of the statute, and in that statute the state reserves a power of control
which it would unquestionably have by the common law, because of
the nature of the business in which such corporations are authorized
to engage. That business is such that the property of all corporations
organized thereunder becomes affected with a public use, and is there-
fore subject to public regulation and control. The corporations which
may be authorized under section 2841, R. L. 1905, are such as fall
within the ordinary conception of a public service corporation. The
"business" of such a corporation is determined by its charter state-
ment of purposes, which must be within the scope and limits of the
statutory authorization. Every such corporation is by the same.
statute (R. L. 1905, § 2842) expressly authorized to condemn "such
private property as may be necessary or convenient for the transaction
of the public business for which it was formed." This "public busi-
ness" includes the construction of works for supplying the public, by
whatever means, with water, light, heat, and power. In this connection
the state expressly reserves the right at all times "to supervise and
regulate the business methods and management of any such corpora-
tion and from time to time to fix the compensation which it may charge
or receive for its services." In addition thereto it is provided that
"every such corporation obtaining a franchise from a city or village
shall be subject to such restrictions and conditions as from time to time
may be imposed upon it by such municipality."

The appellant was organized under these statutes, and the nature
of its business, as stated in its articles of incorporation, is "to generate
electricity in the state of Minnesota by steam or water power for
public use, and to distribute and supply such electricity to the public
for light, heat and power purposes." The generation of electrical pow-
er for distribution and sale to the general public on equal terms is a
public enterprise, and property used for such purpose is devoted to a
public use. Minnesota Canal & Power Co. v. Koochiching Co., 97
Minn. 429, 107 N. W. 405. The articles recite that this is to be done
for the public on equal terms and for a reasonable compensation, sub-
ject, as required by the statute, to the supervision and control of
the state of Minnesota. The petition in this proceeding alleges that
for the purpose of accomplishing the purpose for which the corpora-
tion was organized it has undertaken the work of internal improvement

therein described in detail, and that "all of said works are to be constructed and maintained for public use on equal terms by all municipalities, persons and corporations for a reasonable compensation subject to the state of Minnesota."

The incorporation of the appellant is for a specific purpose, and the law of its corporate being requires it to exercise its powers subject to the supervision and control of the state. It must serve the public on equal terms and for a reasonable compensation. By accepting the franchise it has consented to exercise its powers, subject to this supervision and control, in the interest of the public. Stewart v. Great Northern Ry. Co., 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427; Charleston v. Lowe, 52 W. Va. 662, 671, 44 S. E. 410; Olmsted v. Proprietors, 47 N. J. L. 311; Haugen v. Albina, 21 Ore. 411, 28 Pac. 244, 14 L. R. A. 424; Cincinnati v. Village, 57 Oh. St. 336, 345, 49 N. E. 121, 41 L. R. A. 422; American v. State, 46 Neb. 194, 64 N. W. 711, 30 L. R. A. 447, 50 Am. St. 610; Crumley v. Watauga, 99 Tenn. 420, 41 S. W. 1058; Griffin v. Goldsboro, 122 N. C. 206, 30 S. E. 319, 41 L. R. A. 240; Rockingham Co. v. Hobbs, 72 N. H. 531, 58 Atl. 46, 66 L. R. A. 581. In granting this charter the state reserved the right to regulate the business of the corporation. By accepting the franchise the corporation engaged to use it in such a manner as will accomplish the objects for which the legislature granted the charter.

It is also contended that the appellant cannot exercise the power of eminent domain until after the legislature has actually exercised its power of control by the enactment of some regulating statute. The state has granted the power of eminent domain in present terms, subject to its right to regulate the future business of the corporation. It may regulate this business whenever the conditions arise which call for such regulation; that is, whenever there shall be improper business methods to be corrected or unequal rates to be equalized. It is not necessary that the state shall pass statutes in detail regulating the business and rates of the petitioner before it can exercise the right of eminent domain for the purpose of enabling it to construct its works. Railway corporations were recognized as public service corporations, and granted the right of eminent domain in this and other states, long before there were any statutes to regulate the conduct of their business or to fix the rates which they might charge. Street car com-

panies, telegraph and telephone companies, and gas and electric light companies were recognized as public service corporations and given the power of eminent domain under similar conditions. All such corporations are nevertheless public service corporations, and because of the nature of the business in which they are engaged and the fact that they have been granted the power of eminent domain, are subject to reasonable state and municipal control whenever circumstances arise which require such control.

Nor can we see any force in the respondents' contention that the petitioner is not a public service corporation because it has no franchise from any municipality and no contract to furnish any city or village with its products. This, again, is inverting the natural order of things. To deny to a corporation, organized for a purpose which under the statute would entitle it to the power of eminent domain, the right to exercise the power until it has obtained a franchise from some municipality, or made a contract to furnish its product to some city or village, would be to deprive it of the means by which it is enabled to construct its works and be in a position to obtain a franchise or contract. For instance, the appellant has done nothing in the way of actual construction of its proposed works. It has made the preliminary survey, and we may assume is ready to commence actual construction, but can proceed no further until it acquires certain private property, which can be obtained only through condemnation proceedings. It may never be called upon to serve a city or village. If it does, it must obtain a franchise and submit itself to such further conditions and restrictions as from time to time may be imposed upon it by such municipality. In the meantime it must serve the general public, individuals and corporations, on equal terms, and at all times hold itself in readiness to serve municipalities, as well as individuals and private corporations. If it fails or neglects to do so, the power of regulation and control is in the state. The appellant is therefore a public service corporation such as is authorized by R. L. 1905, §§ 2841, 2842, and is entitled to exercise the power of eminent domain in a proper case.

2. The respondents contend that, even though the appellant is a public service corporation with the power of eminent domain, it cannot

exercise its power in this particular instance, because: (a) The taking of private property for the declared purposes is not authorized by the laws of the state; (b) the waters affected thereby are navigable waters of the state and United States, and the state, as trustee thereof for the public, cannot authorize the diversion of such water; and (c) the diversion of the waters of Birch lake and the streams tributary to and flowing therefrom is prohibited by the acts of congress and the treaty between the United States and Great Britian.

3. Since the decision in the Koochiching Company case, the legislature has adopted a revision of the laws of the state which materially changes the provisions of the statutes which were there considered. The former statutes contained certain restrictions, and the doubt as to statutory authority was properly resolved against the petitioner. The present statutes, when fairly construed, authorize the condemnation of private property in aid of an enterprise such as that described in this petition, unless the necessary effect thereof involves the doing of some act which is forbidden by some other state or federal law. In other words, the statutes now authorize the exercise of the power of eminent domain in aid of the construction of canals and reservoirs to be used for the purpose of creating and distributing electric power for the use of the general public. Whether this power can be exercised when the result is to interfere substantially with navigable waters and lakes is another question.

R. L. 1905, § 2841, povides that "corporations may be organized for the construction, acquisition, maintenance, or operation of any work of internal improvement, including railways, street railways, telegraph and telephone lines, canals, slack-water or other navigation, dams to create or improve a water supply or to furnish power for public use, and any work for supplying the public, by whatever means, with water, light, heat, or power, including all requisite subways, pipes, and other conduits." * * *

Section 2842: "The state shall at all times have the right to supervise and regulate the business methods and management of any such corporation and from time to time to fix the compensation which it may charge or receive for its services. * * * Every such corporation may acquire by right of eminent domain, such private property as

may be necessary or convenient for the transaction of the public business for which it was formed; provided that no street railway company shall have or exercise such right within the limits of any city or village."

Section 2926, R. L. 1905, provides that "any public service corporation shall have the right to obtain by condemnation under the right of eminent domain, any land or any right over, through or across the same, or any easement therein necessary for the convenient prosecution of its enterprise."

Section 2927, R. L. 1905, provides: "Any water power, telegraph, telephone, pneumatic tube or electric light, heat or power company may use public roads for the purpose of constructing, using, operating and maintaining lines, subways, or conduits, for their business, but such lines shall be so located as in no way to interfere with the safety and convenience of ordinary travel along or over the same; and in the construction and maintenance of such line, subway, canal, or conduit the company shall be subject to all reasonable regulations imposed by the governing body of any town, village or city in which such public road may be."

Chapter 360, p. 579, Laws 1901, amending section 2604, G. S. 1894, which limited the right to canal to a "canal in and along the valley of such river, bay, stream, lake or watercourse," and restricted the right to purchase and erect all necessary buildings for the operation and prosecution of any manufacturing business by water power "incidentally created by such improvement," has been repealed. This is also true of section 2385, G. S. 1894, which declared all rivers in the state of sufficient size for floating or driving logs, timber, or lumber, and which may be used for that purpose, to be public highways, so far as to prevent obstructions to the free passage of logs, lumber, and timber down the same. This statute was merely declaratory of the common law. It may also be noticed that, while the former [2] authorized incorporation for the construction of "any work or works with all requisite subways, pipes and other conduits for supplying the public with water, gas light, electric light, heat, or power," the present statute broadens the language by adding, after "the public," the words "by whatever

[2] G. S. 1894, § 2592 (Reporter).

means." Supplying the public with light, heat, and power by whatever means is thus specifically included in the enterprises in aid of which private property may be acquired by the exercise of the power of eminent domain. The word "canals," which appears in section 2927, is new; but it does not seem of much importance in this connection, as the section relates only to the use of the public roads by a public service corporation. We think the changes in the statutes are sufficient to indicate the intention of the legislature to authorize the condemnation of private property for purposes which were not authorized before the enactment of the Revised Laws of 1905. The present statutes grant large powers to corporations organized for the purposes described in section 2842, and in aid of all such purposes the power of eminent domain may be invoked.

4. Conceding that the petitioner is authorized by the statutes to exercise this power and condemn private property which is required in the course of the construction of canals and reservoirs to be used for the generation of electric power, it remains to be seen whether the power can be exercised when the particular enterprise involves the interference with and the diversion of navigable waters of the state. This question is distinct from that of the right of a corporation to condemn private property under any conditions. A general grant of the right to condemn private property for a public use must be construed as granted in aid of an enterprise which in itself is authorized by law and the carrying out of which does not involve the breach of some existing law; that is, a corporation may have the right to build a dam or reservoir and condemn private property in aid thereof, and yet not have the right to condemn in aid of a particular dam or reservoir when the necessary consequence will be the violation of a statute which forbids the interference with certain waters or waters of a certain character. It does not follow that, because the state has authorized the creation of corporations with power to engage in certain kinds of business and granted to them the right of eminent domain, it has authorized particular enterprises of the designated character, regardless of the consequences in particular cases. A dam or reservoir for the creation of power may or may not interfere with the navigability of the waters affected thereby, and, if the statutes and general public policy of the

state show an intention to prevent the navigable waters from being interfered with, it will be presumed that only such dams, reservoirs, and canals may be constructed as do not interfere with the public right of navigation. Navigable waters are already devoted to a public use, and power to condemn for a public purpose property which is already appropriated to another public use does not exist, unless granted specifically or by necessary implication.

(a) An examination of the present statutes shows that the state has carefully guarded the rights of the public in its navigable waters, and that interference with navigation is permitted only in exceptional cases and within carefully defined restrictions.

R. L. 1905, § 434, provides that the county board in counties having more than two hundred thousand inhabitants shall have power to appropriate money to improve the navigation of lakes lying wholly or in part within such counties. Section 2933 authorizes corporations formed for the purpose of driving logs to improve any stream or its tributaries upon which no other person or corporation has constructed any dam or other improvement, by the construction of sluiceways, booms, dams, and other works for the driving, holding, and handling of logs therein. The placing of any obstruction to navigation in such stream below the head of steamboat navigation is expressly forbidden. Section 2934 defines the powers of such corporations. But chapter 89, p. 106, Laws 1905, re-enacted these sections with some changes and amendments. What may be done in the way of improving the stream is stated in detail, and, instead of the prohibition upon obstructions below the head of steamboat navigation, it is provided that "such corporations shall in no case, in any manner, materially obstruct or impede steamboat navigation, or driving, or handling of logs." Section 2543 authorizes the construction of dams across nonnavigable streams. Section 2547 empowers county boards to license any suitable person who owns or controls the land on both sides to erect a dam across any stream within the county or bordering thereon, for the purpose of sluicing or driving the logs, upon being satisfied of the necessity therefor. Section 2550 provides that the owner of land bordering upon any stream or other watercourse, not navigable by steam, but available for floating logs, lumber, or timber, may dam the same and construct, in

connection with such dam, all raceways and other appliances necessary to the development of water power for any lawful purpose or for the supplying of water to municipalities. If such stream or watercourse be a common boundary between the state and any other state or country, the consent, if any is required by law or treaty, from owners of the opposite bank, from the state or country bordering thereon, and from the United States, shall be first obtained. This section suggests the authority for the present proceedings; but it will be observed that the petition did not bring the case within its provisions. Section 2551 provides that "all private property necessary to be taken or damaged for the purposes of such dam may be condemned under the provisions of chapter 41, R. L. 1905."

Section 2552 authorizes the county board, in order to promote the public health and improve the navigation of any lake situated in a single county, to establish a uniform height at which the waters shall be held, and for such purposes to erect dams. Section 2561 confers the same authority upon the council of any city or village with reference to lakes situated in whole or in part within their limits. Section 2562 exempts from the operation of these laws all dams maintained and used for sluicing and driving logs, lumber and timber. There can be no interference therewith or with the stage of water used in such sluicing and driving. Section 727, subd. 8, empowers village councils to enact ordinances for the purpose, inter alia, "to establish and maintain drains, canals and sewers and to alter, widen or straighten watercourses," within the village limits. Section 734 authorizes the assessment of the cost of such works upon the property benefited thereby. Section 2147 prohibits the pollution of water of any stream or pond used as the source of any water supply, and section 2131 authorizes the state board of health to adopt rules and regulations to prevent the pollution of such waters. Section 2500 makes it a misdemeanor to "raise or lower any of the lakes or streams within" Itasca State Park.

Section 5131 makes it a felony to interfere with any pier, boom, or dam lawfully erected upon any stream within the state or forming the boundary thereof. Section 4987 defines a public nuisance as a crime against the order and economy of the state, and makes it consist in unlawfully doing an act or omitting to perform a duty which "shall unlawfully interfere with, obstruct, or tend to obstruct, or render dan-

gerous for passage, a lake, navigable river, bay, stream, canal or basin," etc. Section 5128 makes it a crime to injure or interfere with the lights placed on or along navigable waters by the United States government. Section 5146 makes it a crime to drain or attempt to drain in any manner any meandered lake, pond, or body of water; but this shall not prevent the reasonable use of such bodies of water as reservoirs for any milling or manufacturing establishment, for the purpose of driving logs, or supplying any city, village, or town with water, and none of the provisions of this section shall apply to any case where the county board shall drain such body of water under the provisions of law.

This body of legislation clearly discloses an intention to keep the navigable waters of the state free from obstruction whenever possible. Section 5146 makes it a crime, except when expressly authorized, to divert the waters of any meandered lake, except as it results from the free use of the waters for milling, manufacturing, and lumbering, and water supply for cities and villages. In the few instances where dams are authorized, the methods of construction are carefully described and the rights of navigation strictly preserved. Section 2562 exempts streams used for logging operations from the operation of sections 2552 and 2561.

All this legislation with reference to water and watercourses assumes that navigation must not be interfered with unless for extraordinary reasons, and then only when expressly authorized. There is no express authority to interfere with the navigation of these waters for the purposes described in the petition. But the trial court treated these motions as demurrers, and granted them because the petition does not state facts sufficient to authorize the court in granting the prayer. The allegations of the petition must be taken as true, and it follows that the proposed diversion of waters which will result from the construction of these works will not interfere with the navigation of the waters. The petition alleges

> That your petitioner's said works and the diversion of water as proposed by your petitioner will not interfere with the navigable capacity of any of said waters and will not interfere with any navigation of which they are capable, and your

> petitioner's works can and will be so conducted as not to interfere with such navigation or any public use thereof, but, on the contrary, so as to aid and facilitate the same and so as to increase and improve the navigable capacity of said waters.

If this statement is true, the construction of the petitioner's works will not injure the navigation or interfere with the other public use of Birch lake and its tributary waters. We find nothing in the statutes of Minnesota or in the public policy of the state which forbids the petitioner from constructing its proposed work, if it is able to prove the allegations of the petition.

5. The appellant admits that it cannot construct dams over or place obstructions in the navigable waters of the United States without first obtaining permission from the federal government. The petition states that,

> It having been claimed that the waters flowing out of said Birch lake drainage basin are navigable waters of the United States, your petitioner has made application pursuant to the act of congress relating to the subject to the chief of engineers of the United States Army and the secretary of war for the recommendation of said chief of engineers and the authority of the secretary of war to make such diversion of water and for the approval of its plans and structures therefor, which application is now pending.

From the statements contained in the brief it appears that an application has been made to the chief of engineers and the secretary of war for permission to erect dams and divert waters and for the approval of the plans of the petitioner's several dams. Certain engineer officers to whom the matter was referred, after inquiry into the conditions which exist in the Birch lake drainage basin, reported to the secretary of war that under the act of March 3, 1899, the proposed dams may properly be built if the plans thereof are first duly approved, and that the water may be diverted if recommended by the same officials. The International Waterways Commission, to which the matter was referred by the secretary of war, recommended that the permit be not granted without the concurrence of the Canadian government.

Report Nov. 5, 1906. It is admitted that the consent of the United States government has not yet been obtained.

It was held in the Koochiching Company case that the waters in question are navigable waters of the state and of the United States, and they are so considered by the federal authorities. The power of congress over navigable streams is an incident to its power to regulate commerce, and the United States may control all structures and works which interfere in any manner with the navigable capacity of the navigable waters of the United States, which either of themselves or in connection with other waters form channels for interstate commerce. In the absence of the exercise of this power by congress the states have full power over such waters within their jurisdiction. Congress has recognized the fact that it is desirable that the states should exercise a large measure of power over navigable waters, and has left to them the control and management of bridges and such structures, subject to the right of the United States to interfere and supersede the state authority when it is exercised in such a manner as not to meet with the approval of congress. Navigable waters entirely within the limits of a state are subject to the same control of congress as those extending through or reaching beyond the limits of a state. Rhea v. Newport, N. & M. V. R. Co. (C. C.) 50 Fed. 16, 21.

The present federal legislation with reference to navigable waters is found in River and Harbor Appropriation Act March 3, 1899, c. 425, 30 St. 1151 [U. S. Comp. St. 1901, 3540, 3541], and in Act June 21, 1906, c. 3508, 34 St. 386, Fed. St. Ann. Supp. 1907, 314. Section 9 of the act of 1899 provides that "it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river or other navigable water of the United States until the consent of congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to, and approved by, the chief of engineers and by the secretary of war; provided, that such structures may be built under authority of the legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to, and approved by the chief of engineers and by the secretary of war before construction is commenced." Sec-

tion 10 of the act provides "that the creation of any obstruction not affirmatively authorized by congress to the navigable capacity of any of the waters of the United States is hereby prohibited * * * and it shall not be lawful to excavate or fill or in any manner to alter or modify the course, location, condition, or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater or of the channel of any navigable water of the United States unless the work has been recommended by the chief of engineers and authorized by the secretary of war prior to beginning the same." 6 Fed. St. Ann. 805.

This statute forbids the commencement of the construction of any dam or structure such as therein described over any navigable river of the United States without the consent of the chief of engineers and the secretary of war, regardless of the effect on navigation. This consent must be obtained before construction is commenced. It is also made unlawful to in any manner alter the course, location, condition, or capacity of any navigable water of the United States, unless the work has been recommended by the chief of engineers and authorized by the secretary of war prior to commencing the same. These are conditions precedent, and the prohibitions of the act of congress reach every person and corporation in the United States. An act of congress is binding upon the state, as well as upon the federal, courts. The appellant cannot legally commence the construction of its dams and reservoirs without the previous consent of the chief of engineers and the secretary of war. The courts of this state are asked in this proceeding to say that the enterprise is proper, and to authorize the petitioner to proceed without complying with the acts of congress. Before the prayer of the petition can legally be granted, the court must say that the enterprise is authorized by law. This it cannot do until the petitioner shows that it has complied with the conditions of the act of congress. The statute does not transfer the exclusive control over navigable waters which lie entirely within the limits of a state to the federal authorities. The right of private persons to erect structures in such waters requires the concurrent or joint consent of both the general and state governments.

In Lake Shore & M. S. Ry. Co. v. Ohio, 165 U. S. 365, 17 Sup. Ct. 357, 41 L. Ed. 747, the court said: "The contention is that the stat-

ute in question (Act Sept. 19, 1890, c. 907, §§ 5, 7, 26 Stat. 453) manifests the purpose of congress to deprive the several states of all authority to control and regulate any and every structure over all navigable streams although they be wholly situated within their territory. * * * The construction claimed for the statute is that its purpose was to deprive the states of· all power as to every stream, even those wholly within their borders, whilst the very words of the statute * * * demonstrate that the object of the act was not to deprive the several states of the authority to consent to the erection of bridges over navigable waters wholly within their territory." After the act of 1899 was passed certain parties attempted to construct a dock in the Calumet river within the limits of the city of Chicago, with the consent of the chief of engineers and the secretary of war, but without compliance with an ordinance of the city, which required a permit from the department of public works as a condition precedent to the construction of any docks within the limits of the city. It was held that the authority of the state over navigable waters within its limits is plenary, subject only to such action as congress may take in execution of its power to regulate commerce among the states. The court said in reference to the act of 1899: "The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river within the limits of a state depend upon the concurrent or joint assent of both the national government and the state government. The secretary of war, acting under the authority conferred by congress, may assent to · the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the state acting by its constituted agencies." Cummings v. Chicago, 188 U. S. 410, 23 Sup. Ct. 472, 47 L. Ed. 525.

The rule was restated in Montgomery v. Portland, 190 U. S. 89, 23 Sup. Ct. 735, 47 L. Ed. 965. "Its general legislation so far," said Mr. Justice Harlan, "means nothing more than that the regulations established by the secretary in respect to waters, the navigation and commerce upon which may be regulated by congress, shall not be disregarded, even by the states. Congress has not, however, indicated its purpose to wholly ignore the original power of the states to regulate

101 M.—15

the use of navigable waters entirely within their respective limits. Upon the authority, then, of Cummings v. City of Chicago, and the cases there cited, to which we may add Willamette Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629, we hold that under existing enactments the right of private persons to erect structures in a navigable water of the United States that is entirely within the limits of a state cannot be said to be complete or absolute without the concurrent or joint consent of both the general and state governments." The matters required by this statute to be determined by the secretary of war are not legislative in their nature, and therefore may properly be delegated. Union Bridge Co. v. U. S., 27 Sup. Ct. 367.

Although the petitioner's enterprise is forbidden without the approval of the designated federal officers, it contends that the state should give its consent, and approve the condemnation proceedings, and permit it to obtain the consent of the United States whenever in the future it is able to do so. The rule that the courts will not dictate the order in which a petitioner shall proceed to acquire property rights which are necessary to its enterprise is not applicable. This is not a question of acquiring other property necessary to enable the petitioner to proceed with its plan. It is a question of legal right to proceed. The objection goes to the very heart of the matter. The petition is presented to the court by a corporation which under the laws of the state is granted the power of eminent domain in aid of the specific enterprise described in the petition. We assume that the taking of this land is necessary, but the taking cannot be lawful when the enterprise—the construction of the dam, canals, and reservoirs—is unlawful under the laws of the United States. It will not do to say that these landowners are not interested in the matter of obtaining the consent of the United States government. Their property can be taken only for a public purpose and for the specific public purpose described in the petition. If the land is taken, it may never be used for that purpose, because the petitioner may not be able to obtain the necessary authority. It is not a mere formality granted upon application as a matter of course, as the petitioner must have learned from the history of the proceedings as stated in the briefs. The landowner has a right to demand that the petitioner allege and show that the works which it intends to

construct with the aid of his land can be constructed under the existing laws.

In Winter v. New York, 51 N. J. L. 83, 16 Atl. 188, it was held that a petition for the assessment and appraisement of damages for the taking of lands for the erection of telephone poles must show that the telephone company is organized under the laws of the state, and that the common council of the city within which the poles are to be erected has designated the streets in which the poles are to be placed. There are cases which seem to hold to the contrary, but a careful examination discloses their inapplicability on the facts of this case.

It may be conceded that the court will not control the order in which different lands shall be condemned, when the acquisition of several tracts is necessary for carrying out the enterprise. Thus, where a railway extends through the country and also through towns and villages, it may condemn land for a right of way in the country without showing that it has obtained a franchise from the towns or cities to occupy the streets, because the enterprise may be successfully carried out, although the franchise may not be obtained. Other routes may be selected, and the towns and villages may even be left to one side. We are referred to a few cases which hold that legislative authority to condemn a right of way through the streets of a city may be exercised without first having obtained a franchise from the city to run cars upon the tracks. The authority being derived from the state law, it has been held that the construction and operation of the road may proceed, and the consent of the city, which would at the most amount to no more than a license, be subsequently obtained. Metropolitan v. Chicago, 87 Ill. 317. This case is approved in Chicago v. Dunbar, 100 Ill. 110.

Another case to which our attention is called is California v. Kimball, 61 Cal. 90. The railway company undertook to condemn the right of way through a city without first securing the right to use the streets. The court said: "The lands of appellants cannot be taken until paid for, and then for no other purpose than that designated in the complaint. If a grant by the city authority is essential to the right to use the streets for railroad purposes, it can make no difference to the appellants whether such grant is or is not obtained by the plaintiff." The

statement that it can make no difference to the owner of land which is taken in invitum for a specific public use whether the land will ever be devoted to such use carries its own answer.

Denver v. Denver, 30 Colo. 204, 69 Pac. 568, 60 L. R. A. 383, was a proceeding by an irrigation and power company to condemn land for a reservoir site within the limits of the forest reservation of the United States. It was held that the petitioner need not first show compliance with the statute relative to the location of reservoirs upon such reservation. Act March 3, 1891, c. 561, § 18, 26 St. 1101 [U. S. Comp. St. 1901, 1570], provided "that the right of way through the public lands and reservations of the United States is hereby granted to any canal or ditch company formed for the purpose of irrigation and duly organized under the laws of any state or territory, which shall have filed or may hereafter file with the secretary of the interior a copy of its articles of incorporation and due proofs of its organization under the same, to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals and fifty feet on each side of the marginal limits thereof." 6 Fed. St. Ann. 508. The irrigation company had the legal right to locate its reservoir on the public lands and reservations, subject to certain clearly defined restrictions and conditions with which it could easily comply. In the present case the construction of dams and diversion of waters is forbidden without the consent of certain officers, and the granting of permission rests in the discretion of such officers. They are at liberty to grant or refuse permission to proceed, and their action is in no way subject to the control of the petitioner.

6. The respondents claim that, as the Birch lake drainage area is tributary to the Rainy river and the various lakes which form the international boundary between the United States and Canada, the diversion of the waters to Lake Superior would be a violation of international comity. The contention cannot be sustained on principle or authority. Birch lake and its tributary waters are entirely within the United States, and under the generally accepted rules of international law are subject to its exclusive control, without responsibility to any foreign government or its citizens. Modern international law rests upon the conception of territorial sovereignty. The territory of a na-

tion consists of the land and waters within its geographical boundaries and the waters which wash its shores to the extent of a marine league, or other distance determined by custom or treaty, from the shore. See Mortensen v. Peters (1906) 14 Scots' Law Times, 227, 1 Am. Jour. Int. Law, 626, and article by A. H. Charterio in 16 Yale Law Review, 471. Over this territory the jurisdiction of the nation is exclusive and absolute. Schooner Exchange v. McFaddon, 7 Cranch, 116, 136, 3 L. Ed. 287.

Back of the present condition of the law of nations there is a long and interesting history, which discloses states struggling to acquire and maintain the right of free navigation of rivers which extend through the territories of different states. One group of writers has contended that the right to navigate such a stream throughout its entire course is absolute, another denies the right, while a third claims the right of navigation subject to such reasonable regulations as shall be imposed · by the riparian nation. Out of the conflicting contentions has come a body of conventional law which governs the use and enjoyment of the great water highways of the world. Bonfil, Manuel de Droit Int. (4th Ed.) c. 3; Wheaton, Hist. Law of Nations, 283, 552; 1 Halleck, Int Law, pp. 173, 174; Conventional Law of Europe as to the Great Rivers; 1 Twiss, Law of Nations, § 145; Taylor, Int. Law, § 234, et seq. In the early history of the United States the fact that the lower portions of the Mississippi and St. Lawrence flowed through foreign countries induced American statesmen to adopt the reasoning of Grotius and his immediate successors, and contend that certain things are, by their very nature, incapable of appropriation, and that the right of passage by water over territory was one of the natural rights reserved for the general advantage of all mankind. Grotius, De Jur. Bel. Ac Pac. II, c. 2, §§ 11–13; Justinian, Inst. II tit. § 1; Taylor, Int. Law, §§ 236, 237; Schuyler, Am. Dip. 265–366. The negotiations finally resulted in treaties which were mutually beneficial.

The modern development of irrigation has revived the controversy in a somewhat different form, and it is again asserted that a river which flows through the territory of several states or nations is their common property, and that the inherent right of a nation to protect itself will justify the one lower down the stream in preventing by force the diversion of the waters before they reach its boundaries to such an extent as

to interfere materially with the natural flow. This claim has been asserted by Mexico against the United States in connection with an irrigation dam which deprives the citizens of Mexico of the water which in the ordinary and unimpeded course of nature flows across the international boundary. The United States denies any liability for damages resulting therefrom to citizens of Mexico. Opinion of Atty. Gen. Harmon, 21 Ops. Attys. Gen. 274. See Sen. Doc. 229, 55th Cong. 2d Sess.; Sen. Doc. 104, 56th Cong. 2d Sess.; Sen. Doc. 154, 57th Cong. 2d Sess.

More recently, on August 11, 1905, the Mexican ambassador in a communication to the secretary of state reasserted the claim and cited the opinions of certain Mexican jurists and also a recent American text-book as supporting his views. On December 19, 1905, Mr. Secretary Root wrote: "Referring to Mr. Gamboa's note  *  *  *  touching the distribution of the waters of the Rio Grande river for the purpose of irrigation, the department has to say that it is unable to admit the soundness of the legal position stated in the said note.  *  *  *  It is stated in Mr. Gamboa's note that the opinions of Messrs. Vallarta and Gamboa rest on the doctrine announced by H. P. Farnham in his work on 'The Law of Waters and Water-rights,' pages 29 and 63 of volume 1 being cited. Inasmuch as Mr. Farnham cited no decision and no text in support of the doctrine of international law announced by him, and inasmuch as the department has been unable to find any solid foundation for such opinion, a personal letter was written to Mr. Farnham inquiring upon what authority he had founded his statement of opinion, to which inquiry Mr. Farnham answered in substance that the expressions contained in the text were merely his personal opinions, deduced from the comparison of treaties, text-writers, and decisions. It is, however, not intended to reopen any argument on the legal questions involved; but it appears to be necessary to say thus much in reaffirmance of the department's position, taken in accordance with the advice of Attorney General Harmon, of the nonliability of the United States government for the claims for indemnity heretofore brought forward by Mexico on account of the aforesaid diversion of the waters." The United States, therefore, recognizes no international comity which prevents it from exercising full control over the waters which lie within its geographical boundaries.

But the United States has by treaty placed restrictions upon the right to use the waters which flow into the Rainy river. The provision of the Webster-Ashburton treaty of 1842 was designed to preserve the boundary waters for the common use of their citizens. Article 2 of the treaty provides: "It being understood that all the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods and also Grand Portage from the shore of Lake Superior to the Pigeon river as now actually used shall be free and open to the use of the citizens and subjects of both countries." 7 Fed. St. Ann. 582. It is clear that any diversion of these waters by means of dams and reservoirs constructed within American territory, which would deprive the citizens of both countries of the common use of the boundary waters, would violate this provision of the treaty. The effect of the treaty is not necessarily involved in this case, as, regardless of its provisions, the petitioner cannot proceed with its enterprise until it has complied with the condition prescribed by the act of congress. But elaborate briefs have been filed in which the effect of the treaty is discussed, and a few words with reference to it seem therefore appropriate.

The obligation of the United States to respect a treaty is at least equal to that which rests upon an individual to observe the terms of a private contract. An individual may break a contract, and a nation may break a treaty. For the breach of a private contract an individual may be held responsible in the court. For the breach of a treaty a nation is responsible only to the other contracting power, its own sense of right and justice, and the public opinion of the world. Its treaty obligations are not cognizable ordinarily in any court of justice deriving its authority from municipal law. A treaty entered into by the United States in accordance with the constitutional requirements, which does not require legislation to carry its provisions into effect, is a municipal law, as well as an international contract. Foster v. Neilson, 2 Pet. 253, 9 L. Ed. 415. Article 6 of the constitution of the United States provides that "this constitution and the laws of the United States which shall be made in pursuance thereof and all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land; and the judges in every state shall

be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

The federal courts have given full force and effect to this provision of the constitution, which declares a treaty the law of the land supreme and paramount over state constitutions and laws. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568; U. S. v. Schooner Peggy, 1 Cranch, 103, 2 L. Ed. 49; Hauenstein v. Lynham, 100 U. S. 483, 25 L. Ed. 628; Head Money Cases, 112 U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798; Geofroy v. Riggs, 133 U. S. 258, 10 Sup. Ct. 295, 33 L. Ed. 642; 1 Butler, Treaty Making Power, § 6; 1 Von Holst, Const. L. §§ 8–10; 2 Story, Const. L. § 1836, et seq. Such a treaty operates directly upon the citizens of the United States, and thus becomes a controlling law to which full force and effect must be given by state as well as federal courts. Opel v. Shoup, 100 Iowa, 407, 420, 69 N. W. 560, 37 L. R. A. 583; Doehrel v. Hillmer, 102 Iowa, 168, 71 N. W. 204; Meier v. Lee, 106 Iowa, 303, 76 N. W. 712; Schultze v. Schultze, 144 Ill. 290, 33 N. E. 201, 19 L. R. A. 90, 36 Am. St. 432; Telefsen v. Fee, 168 Mass. 188, 46 N. E. 562, 45 L. R. A. 481, 60 Am. St. 379; In re Wyman, 191 Mass. 276, 77 N. E. 379; Cornet v. Winton, 2 Yerg. 143; Maiden v. Ingersoll, 6 Mich. 373; Yeaker v. Yeaker, 4 Metc. (Ky.) 33, 81 Am. Dec. 530; Respublica v. Gordon, 1 Dall. 233, 1 L. Ed. 115. All these cases arose between individuals contending for rights created by treaties, and appellant claims that the courts can recognize a treaty as the supreme law of the land only when it is called upon to protect individual rights created by the treaty. It is, of course, conceded that the courts can give no redress to a party who is injured by the failure of a government to observe the terms of a treaty. A party so injured must look to his government for relief.

But there is another phase of the question which is presented indirectly at least by the present proceeding. A treaty may stipulate for the protection of the rights and privileges granted or conceded therein to the people of the other contracting power. The United States may thus be a party to a treaty which prohibits its citizens or the states from doing some designated thing. Being the supreme law of the land, the treaty is obligatory upon all the courts and people

of the nation. Its prohibitions recognize no state lines. Every citizen of the United States is under a duty to observe and respect the law of the treaty. The petitioner is proceeding to construct dams and reservoirs which it is claimed will result in a violation of the Webster-Ashburton treaty. If this result would follow the construction of such works, we are very clear that the courts of the state should not authorize any proceeding which would result in the violation of the treaty. The act of congress of March 3, 1899, has been referred to as being inconsistent with the Webster-Ashburton treaty. If this is true, it supersedes the treaty as a municipal law, because the last expression of the legislative will of the nation binds the courts and the citizens of the country, and to the extent to which it is inconsistent with the treaty abrogates the treaty as a municipal law. Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068.

But we do not construe this act of congress as in any way inconsistent with the treaty. The United States reserves a control over the navigable waters which lie within the states, which enables it to prevent any interference therewith which might result in a breach of the treaty. These waters may be used for any proper authorized purposes. If, after investigation, the designated officers of the United States approve the contemplated structures and authorize the diversion of the waters, the parties may proceed with their enterprise, and the United States only is responsible to Great Britian for any resulting breach of the treaty. By the act of congress the United States has reserved to itself the right to determine whether any contemplated work, such as a dam or reservoir, will have that effect. Both the treaty and the act of congress are binding upon the petitioner and upon this court. What the supreme law of the land forbids, except upon a condition precedent, should not be authorized by any court until that conditon has been performed.

The petitioner alleges that the contemplated works will not interfere with the navigation of Birch lake and the waters of the surrounding area. Assuming, as we must for the purposes of these motions, that these allegations are true, the enterprise is not forbidden by the laws of the state of Minnesota. There is no statute which prohibits the use of these waters for such authorized purposes to the extent

described in the petition. It is suggested that consistency requires the application of the same rule with reference to the treaty and the federal statute. But the situation is entirely different. The United States statutes do not forbid the construction of such dams and structures as interfere with navigation. The prohibition is absolute until the proper United States officials have determined whether the contemplated structure will be objectionable. "It shall not be lawful to construct or commence the construction of any bridge, dam * * * over or in any * * * navigable river or other navigable water of the United States," etc., until the consent of congress to the building of such structure shall have been obtained, and until the plans for the same shall have been submitted to and approved by the chief of engineers and the secretary of war. The right to proceed does not depend upon whether the structure will divert the waters or interfere with navigation. It depends upon the consent of the federal authorities. The construction of dams and reservoirs over these waters requires the concurrent consent of both the state and federal governments. The order in which this consent is obtained is of no importance, but both must be given before anything can be done towards the construction of the dam and reservoir.

The condemnation of land which is necessary for the enterprise is not the commencement of the work of construction. But, when a petition for the appointment of commissioners is presented to the court in condemnation proceedings, it is the duty of the court to determine whether the taking of the particular land is necessary and whether the enterprise itself is lawful. Upon the allegations of this petition, the court will probably find that the taking of this land is necessary; but it will be obliged to find that the construction of the dam, reservoirs, and canals necessary for the carrying out of the enterprise is forbidden by the United States statute, except upon conditions which have not been complied with.

The judgment is affirmed.

LEWIS, J. (dissenting).

I concur in the conclusion of the majority that under the provisions of the revised laws of 1905 the petitioner is authorized to exercise the right of eminent domain for the purposes set forth in the petition,

but dissent from the decision that the contemplated improvement of the Birch lake drainage basin is in conflict with the provisions of the Webster-Ashburton treaty, and that consent of the federal authorities is a necessary prerequisite. The decision is of far-reaching importance, but it is not my purpose to attempt anything more than to set forth the grounds for my own views.

The petition proposes to take advantage of a certain natural drainage basin, and, by the erection of proper dams, store the waters that would otherwise go to waste in the spring of the year and conduct them for a distance of more than one hundred miles to a point where the same can be delivered with a fall of six hundred feet, thereby creating a power equal to thirty thousand horses. If not held back in this manner by artificial means, the waters of the basin, coming from the melting snows and spring rains, would rush off through the outlet and be of no service to any one for any purpose; but by the construction of dams at proper points this great amount of water can be held back, be more equally distributed through the streams constituting the outlet, and at the same time leave a large surplus. The petition clearly states that it is the purpose of the petitioner, and the necessary result of the work, to improve the navigability of the streams affected, in so far as they are naturally adapted to navigation, and at the same time utilize the immense surplus waters for commercial purposes.

Upon motion to dismiss the petition the facts stated must be taken as admitted, and, so considered, it does not appear from the petition that the improvement, when perfected, will be in violation of the Webster-Ashburton treaty or of the federal laws. The majority have adopted this view in one part of the opinion: "The trial court treated these motions as demurrers, and granted them because the petition does not state facts sufficient to authorize the court in granting the prayer. The allegations of the petition must be taken as true, and it follows that the proposed diversion of waters which will result from the construction of these works will not injure the navigation of the waters. * * * If this statement is true, the construction of the petitioner's works will not injure the navigation or other public use of Birch lake and its tributary waters. We find nothing in the statutes of Minnesota or in the public policy of the state which forbids the pe-

titioner from constructing its proposed work, if it is able to prove the allegations of the petition." If the facts as stated in the petition are to be taken as true, when considered with reference to the laws of Minnesota, it seems very clear to me that, in order to be consistent, the same concession must be made with reference to the laws and treaties of the United States. From that standpoint, the majority have decided a moot question. However, if we assume that the diversion of the surplus waters of the Birch lake basin in the manner stated may, incidentally and to some extent, at some future time, constitute a diversion of international boundary waters, and affect the navigability of state waters, then the majority are in error in assuming that the courts of Minnesota have jurisdiction to determine those questions.

The law on the question of jurisdiction is clearly stated by Mr. Justice Miller in Head Money Cases, 112 U. S. 580, 598, 599, 5 Sup. Ct. 254, 28 L. Ed. 798: "A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The constitution of the United States places such provisions as these in the same category as other laws of congress by its declaration that 'this constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' A treaty, then, is a law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject

may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute."

It affirmatively appears from the petition that the property rights of no one who is a party to this proceeding can in any way ever be affected by the proposed diversion of the waters referred to in the treaty. Whether the improvement may at some time divert such waters in violation of the Webster-Ashburton or some other treaty between the United States and British governments, is purely a political question, to be settled between the nations interested. No case has been cited to sustain the proposition that a United States treaty is the law of the land, obligatory upon state courts, except those wherein were involved the rights of private parties—for instance, the right of a foreign citizen to inherit land, as provided by the treaty; or the jurisdiction of a state court to determine disputes between subjects of a foreign power with respect to wages of seamen, where such settlements were provided for by the treaty.

It seems to be the view of the majority that it was the purpose of congress, by the act of March 3, to assume, if not dominant, yet equal, control, during construction, of all works and improvements on the navigable streams of the United States, whether wholly within the boundaries of a state or not, and that the approval and co-operation of the federal authorities must be secured in order to initiate such an improvement. The language of the act in question, and the decisions of the federal courts construing similar statutes, contradict this assumption. The whole act should be considered with reference to the proviso: "Provided, that such structures may be built under the authority of the legislature of a state across rivers, and other waterways, the navigable portions of which lie wholly within the limits of a single state; provided, the location and plans thereof are submitted to and approved by the chief of engineers and by the secretary of war before construction is commenced." All that is required by this proviso, when the navigable waters are within the boundaries of the state is that before construction is commenced the location and plans be submitted to the proper officers for approval. The plain object of this enactment was to encourage capital to take the initiative under the laws of the states, and proceed with the improvement, with the single limitation that be-

fore beginning the actual work of construction the constituted federal officers shall have the privilege of overseeing the plans in order that the natural rights of the public in such navigable waters may be protected. If the petitioner, being authorized by the state court, should proceed with the improvement without complying with the act of March 3, the state court would have no jurisdiction to enjoin the progress of the work. That would be a matter within the exclusive jurisdiction of the United States courts; and if the federal authorities do not see fit to move in that direction, it is of no concern to the state courts.

In Denver v. Denver, 30 Colo. 204, 69 Pac. 568, 60 L. R. A. 383, cited in the opinion, the power company sought to condemn ground for a reservoir site located within the limits of a United States forest reserve, and the defendant railroad company, whose right of way was involved, raised the question that the petitioner in the condemnation proceedings had not obtained the consent of the federal government to construct a reservoir within the forest reserve. The court said: "The fact that petitioner may not have leave from the government to maintain a reservoir site upon a forest reserve, if such leave is necessary, or has not complied with the law in this respect, if such is the case, may affect the ability of petitioner to enjoy the lands sought to be condemned, but does not affect its power to condemn such lands as against the respondents. They cannot raise a question which does not concern them, or which rests solely between the petitioner and the government."

I am unable to find any statute or any decision of any court, federal or state, which announces or recognizes the principle that the United States government shall first stamp its approval upon projects of this character before the state courts can recognize it, although authorized by the state laws. What reason is there for such requirement? It imposes a great hardship upon the petitioner. The engineers of the war department may well wish to inspect the plans before actual construction begins, but must the petitioner be held up and put to all that expense, even before legal sanction for the enterprise has been secured from the state courts? The war department engineers might, with good reason, declare that the consent of the state should first be obtained, for the reason that, until it is definitely determined by the state court just what the petitioner is authorized to do, the federal authori-

ties ought not to be called upon to give their consent to the doing of that which the petitioner may never be authorized by its state to do.

START, C. J.

I also dissent, for the reasons stated by Mr. Justice LEWIS.